STATE FARM FIRE AND CASUALTY
COMPANY, Plaintiff,

v.

William E. MILES and Dennis P.
Summerfield, Defendants.

Civ. A. No. IP 87–427C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 25, 1990.

John S. Beeman, Patricia Polis McCrory, Harrison & Moberly, Indianapolis, Ind., for plaintiff.

Robert C. Beasley, Beasley Gilkison Retherford Buckles & Clark, Muncie, Ind., for Summerfield.

Richard E. Kreegar, Chesterfield, Ind., for Miles.

## MEMORANDUM ENTRY REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

TINDER, District Judge.

This case comes before the court on plaintiff State Farm's motion for summary judgment. For the reasons stated below, the court GRANTS plaintiff's motion.

### Statement of the Case

In the early morning hours of December 29, 1985, William E. Miles hit Dennis P. Summerfield in the head with a hammer, severely injuring him. Miles was subsequently convicted of criminal battery [1], and Summerfield filed a civil lawsuit against Miles as well.[2]

As a result of the civil suit, State Farm Fire and Casualty Company (State Farm) filed a declaratory judgment action in this court on April 21, 1987. The complaint seeks a declaration that State Farm is not obligated under Miles' parents' homeowners insurance policy to pay the costs of Summerfield's physical injuries resulting from Miles' actions. In making this claim, State Farm relies on two clauses in Miles' parents' policy. The first clause excludes coverage for bodily injury that is expected or intended by the insured. The second clause excludes coverage whenever the insured has failed to give State Farm timely notification of a claim.

### Jurisdiction

Jurisdiction in this case is predicated upon diversity. State Farm is incorporated in Illinois, and has its principal place of business in Illinois. Defendants Miles and Summerfield are citizens and residents of Indiana. The amount in controversy exceeds $10,000. This court has jurisdiction under 28 U.S.C. § 1332.

### Standard for Granting Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrog-

---

1. *Indiana v. Miles,* Cause No. CS–85–55 (Delaware County Court). Although initially charged with attempted murder, Miles pled guilty to battery with serious bodily injury, a class C felony in violation of Ind.Code § 35–42–2–1(3) (Burns 1985) on May 15, 1986.

2. *Summerfield v. Miles,* Cause No. 27D02–8701–CP–21 (in Grant County). Initially brought by Summerfield against Miles in Delaware County Superior Court, the case was later transferred to Grant County Superior Court. This civil suit resulted in a judgment for Summerfield for damages from personal injury in the amount of $75,000 on December 1, 1987. It is this judgment which State Farm seeks to avoid through this suit.

atories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The party seeking summary judgment has the burden of establishing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When, as in this case, the moving party is the plaintiff, the movant must not only establish all of the essential elements of its claim, but must also defeat all of the defendant's affirmative defenses. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194–95 (5th Cir.1986). If the moving party meets this burden, the non-moving party then "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This court must view the record and the reasonable inferences to be drawn therefrom in the light most favorable to the non-moving party. *Box v. A. & P. Tea Co.*, 772 F.2d 1372, 1375 (7th Cir.1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986).

*Factual Background Construed in Light Most Favorable to Defendants*

During the end of 1985, defendant Miles felt anxiety and stress in many aspects of his life. At that time, Miles was leading what could be termed a hectic life. He was a full-time student at Ball State University, was working full-time at a K–Mart store in Anderson, Indiana. As a result of these and other pressures, Miles was not eating or sleeping well. Miles' anxiety was increased by his daily routine of commuting from his home in Alexandria, to work in Anderson, and then to school and his girlfriend's house in Muncie.

The primary pressure on Miles was his relationship with his girlfriend, Sheila Carey. Miles had dated Carey since 1982, but began to suspect that she was seeing another man, Dennis Summerfield, during the fall of 1985. On several occasions immediately preceding Miles' attack on Summerfield, Miles had discovered Carey in the company of Summerfield under circumstances that made Miles uncomfortable.

For example, on December 21, 1985, Miles made an unexpected visit to Carey's apartment. As he approached the door to her apartment, he heard voices coming from the inside. He knocked on the door and was let into the apartment by Carey. Suspecting that Summerfield was in the apartment, Miles searched it and eventually discovered Summerfield hiding in a closet, smiling. Already jealous and suspicious, Miles then became angry. He slapped Carey across the face, knocked over some furniture in the apartment, ripped up some flowers, and then left Carey's apartment. Such conduct by an otherwise well-mannered young man can only be explained by recalling Maria Edgeworth's comment on the human condition: "Artificial manners vanish the moment the natural passions are touched."

In the early morning of December 29, 1985, Miles phoned Carey at her apartment. Miles asked if he could come over to see her, but she told him that she was not alone. Miles correctly assumed that Summerfield was with her. Following the phone conversation, Miles tried to sleep, but could not. He decided to go to Carey's apartment. On his way there, he picked up a hammer from his garage and put it in a pocket of his jacket. Summerfield had served in the United States Marine Corps and Miles apparently believed that a former Marine carries fighting skills into civilian life. Intimidated by Summerfield's status as an ex-Marine, Miles thought he might need the hammer to protect himself.

When Miles arrived at the apartment, Carey let him in. Miles and Carey talked in the living room for a short time, until Summerfield, who had been asleep, entered the room and began talking with Miles. The conversation became confrontational, with both Miles and Summerfield suggesting that the other should leave the apartment. Abruptly, Miles asked Carey if he could use the bathroom. While in the bathroom, Miles removed the hammer from his jacket. He walked out of the bathroom,

approached within two feet of Summerfield, and swung the hammer, striking Summerfield in the head. Summerfield fell to the floor, bleeding. Miles dropped the hammer, told Carey to call the police, and then left. Miles was arrested and taken to the police station later that morning. Charged with attempted murder, a class A felony, Miles later pled guilty to battery, a class C felony.

In addition to the criminal charge, Miles was subjected to civil liability. In state court, Summerfield sued Miles in tort for damages resulting from his attack. Miles admitted negligence, and the trial for damages resulted in a judgment of $75,000 for Summerfield on December 1, 1987.

During all relevant periods, Miles was covered by his parents' State Farm insurance policy. The insurance policy required that Miles notify State Farm as soon as practicable after the occurrence of an insurable loss. On October 29, 1986, State Farm was notified of Miles' attack and the pending civil lawsuit resulting from it.

In addition to requiring practicable notice of a claim, the insurance policy also contained an exclusion clause which limited coverage for personal liability and payment of medical expenses to others. Under the clause, State Farm was not obligated to pay for "bodily injury ... which is expected or intended by an insured." State Farm Homeowners Policy at 11.

### Issues Presented

There are two issues presented by this motion for summary judgment: (1) Is there a genuine issue of material fact as to whether Summerfield's injury fits within the policy's intended or expected injury exclusion; and (2) is there a genuine issue of material fact as to whether Miles timely notified State Farm in compliance with the terms of the insurance policy? Because I have disposed of the case on the basis of the first issue, I do not reach the second issue.

### Injury Intended or Expected

State Farm can be obligated to pay for Summerfield's injuries only if it accepted this obligation under the terms of the insurance policy that it issued to Miles' parents. This policy obligates State Farm to pay for damages to third parties resulting from bodily injury for which the insured, including any resident relative of the insured, is legally liable. State Farm Homeowner's Policy, Section II, Coverage L and Coverage M. State Farm argues that its obligation under these clauses of the policy is voided by an exclusion clause which reads, "Coverage L and Coverage M do not apply to: a. bodily injury or property damage which is expected or intended by an insured." State Farm Homeowner's Policy, Section II, Exclusion.

Whether this exclusion clause operates to cut off State Farm's obligation depends on the meaning attached to the clause. The parties agree that the clause should be construed according to Indiana law.

■ Under Indiana law, where an insurance contract is susceptible of more than one meaning, the contract must be given the meaning most favorable to the insured. *Home Ins. Co. v. Neilsen,* 165 Ind.App. 445, 332 N.E.2d 240, 244 (1975). If, however, the contract is clear and unambiguous, the language must be given its plain meaning. *South Bend Escan Corp. v. Federal Ins. Co.,* 647 F.Supp. 962, 966 (N.D.Ind.1986).

This exclusionary clause is not ambiguous. It is readily apparent that the clause limits liability if the injury was either expected or intended by the insured, as those terms are commonly defined. As State Farm points out in its brief, the injury need not have been *both* expected and intended—either will suffice to limit the insurer's liability.

There is very little Indiana case law on the meaning of the term "expected" as used in insurance contract exclusionary clauses. Indeed, none of the parties to this suit cited an Indiana case on the meaning of "expected." By comparison, the term "intended" has received much more judicial attention within this state. Unlike Thoreau, who preferred the road less travelled, as a federal judge interpreting Indiana

state law, I must choose the opposite path. Thus, I begin and end my analysis of the exclusionary clause's meaning with the word "intended," and do not reach the meaning of the word "expected."

The leading Indiana case interpreting the meaning of "intended injury" is *Home Ins. Co. v. Neilsen,* 332 N.E.2d 240. In *Neilsen,* the Indiana Court of Appeals examined an exclusionary clause similar to the one at issue here. That court set out three possible meanings for the term "intentional act", but ultimately adopted the following meaning, which I believe should also control this case: "the volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs." *Id.* 332 N.E.2d at 242.

■ The insurance company, of course, bears the burden of proving that Miles' actions on the morning of December 29, 1985 were intentional acts, as that term was defined in *Neilsen. West American Ins. Co. v. McGhee,* 530 N.E.2d 110, 112 (Ind.Ct.App.1988). To meet its burden, State Farm must prove that Miles intentionally struck Summerfield, and that Miles intended to cause some injury to Summerfield.

■ First, State Farm must establish that Miles acted intentionally in swinging the hammer. State Farm is aided in this task by Miles' plea of guilty to criminal battery and his subsequent conviction. Miles' guilty plea is admissible in this case as an admission. *Cromer v. Sefton,* 471 N.E.2d 700, 705 (Ind.Ct.App.1984). Miles' subsequent conviction is also admissible under Indiana Code § 34–3–18–1 (Burns 1986).[3] Under the old common law rule, evidence of a criminal conviction could not be used as evidence in a civil case. *Crom-*

*er,* 471 N.E.2d at 705. Under the statute, however, evidence of a final judgment resulting from a full trial or a plea bargain is admissible[4] in a civil action to prove any fact essential to the judgment so long as the criminal conviction was for a felony. All of these requirements are met in this case. Miles was adjudged guilty of criminal battery, a class C felony, as a result of his plea bargain. State Farm seeks to use this evidence in this civil case to prove Miles' intent—a fact clearly essential to the outcome of this case.

■ By pleading guilty to battery with serious bodily injury, Miles has admitted the commission of a volitional act. The battery statute reads as follows:

### Battery

A person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor. However, the offense is:

*       *       *       *       *       *

(3) a Class C felony if it results in serious bodily injury to any other person or if it is committed by means of a deadly weapon.

Indiana Code § 35–42–2–1 (Burns Supp. 1989).

The defendants argue that this admission of guilt can be explained by the fact that Miles was initially charged with attempted murder, and that his admission of a battery was made only to reduce his risk of serving a long prison sentence. However, the guilty plea and conviction are not the only evidence that the act was volitional. Miles, himself, admitted at deposition the following:

**3.** Indiana Code § 34–3–18–1 provides:
 "Evidence of a final judgment, entered after a trial or upon a plea of guilty, adjudging a person guilty of a crime punishable by death or imprisonment in excess of one [1] year, shall be admissible in any civil action to prove any fact essential to sustaining the judgment, and is not excluded from admission as hearsay regardless of whether the declarant is available as a witness. The pendency of an appeal may be shown

but does not affect the admissibility of evidence under this section."

**4.** State Farm suggests that § 34–3–18–1 permits the use of a prior felony conviction as *conclusive* proof of any element in a subsequent civil action. I read the statute differently. That statute merely permits a trial court to *admit* the felony conviction as evidence, notwithstanding the fact that the admission might be deemed hearsay or that the conviction is under appeal.

She [Carey] told me to leave, and so I went and used the bathroom and pulled out the hammer and walked out, and he [Summerfield] was standing right sort of in front of me, not really. He was standing in front of the bedroom doorway which is right next to the bathroom, and I just swung at him and hit him.

Deposition of William Miles, at p. 25, lines 10–16.

When asked during an interview with an agent for State Farm whether he was trying to hit Summerfield, Miles stated, "Looking back I probably tried to hit him, but I—I just swung the hammer.... There's [a] real good chance I was going to hit him because I was a baseball player...." Exhibit 8, at p. 10. Miles' own statements evidence the commission of a volitional act.

The objective facts surrounding the incident also suggest that his use of the hammer was a volitional act. Miles was extremely jealous over Summerfield's apparent relationship with Carey. He had discovered Summerfield in the company of Carey on several prior occasions that made him very anxious. At deposition, Miles stated that after discovering Summerfield hiding in a closet in Carey's apartment on the 21st of December he wanted to "destroy [Summerfield] at that time," Deposition of William Miles, at p. 36, lines 2–3, and "I wanted to destroy him, but I knew I couldn't." *Id.* at lines 13–14. As Miles left his parents' home to go to Carey's apartment on the 29th of December, he picked up a hammer from the garage. Miles admitted he took the hammer because he believed Summerfield was with Carey and that he might need it to defend himself against Summerfield:

I wanted protection for myself. I knew—my purpose was to talk to her which is what I did. I knew he wasn't going to like me being there, and he wasn't going to understand why I was there, and he was an ex-Marine. Let's face it, they're taught to hurt people. Without thinking they're taught to hurt people, and you know, I wanted some protection against that. I wasn't going to stand there and get my face beat in by some guy. I'm not a violent person. I'm kind of passive. I saw it as being protection.

Deposition of William E. Miles, p. 26, lines 3–13.

During an interview with an agent for State Farm, Miles stated:

I brought a hammer with me too for protection because this guy is big, and I knew just being a Marine that he, you know, I don't want to give a bad stereotype of Marines, but most of them don't have any brains, and they're just violent people.... I really didn't want [to] take anything, but I thought well I don't want to be the one laying [sic] on the floor.

Exhibit 8, pp. 6–7.

These statements clearly suggest that even before Miles had left his house, he anticipated the possibility of violence, and chose to arm himself with a hammer with the intention of using it if needed.

Miles' perceived need to defend himself from Summerfield does not transform his attack into a non-volitional act. In the *Neilsen* case, the defendant/insured likewise argued that he was merely defending himself and was thus entitled to coverage for the damage he caused in self-defense. The Indiana Court of Appeals rejected this reasoning, stating:

The question of self-defense is a standard of [the defendant's] liability to [the injured third party]. It presents an issue of motive or justification for an intentionally caused harm, but it does nothing to avoid the inference of intent to harm that necessarily follows the deliberate blow to the [injured third party's] face.

332 N.E.2d at 244.

Miles' opportunity to argue that he acted in self-defense came in the state criminal and civil actions. Only in those actions were the *motivations* for the attack at issue (i.e. self-defense, duress). In this action, such questions of motivation are not at issue.

Based on Miles' guilty plea and conviction, his subsequent statements, and the objective circumstances of the attack, I

find that Miles' action of swinging the hammer was an intentional act.

■ Second, State Farm must prove that Miles acted with an intent to cause some injury. According to the *Neilsen* court, this intent "may be established either by showing an actual intent to injure, or by showing the nature and character of the act to be such that intent to cause harm to the other party must be inferred as a matter of law." 332 N.E.2d at 244.

Applying this *Neilsen* standard in *West American Ins. Co. v. McGhee*, the Indiana Court of Appeals concluded that the act of double murder-suicide with the blunt end of an axe and a shotgun fired from pointblank range "could only have been committed with an intent to cause injury." 530 N.E.2d at 112. Similarly, Miles' actions immediately before and during the attack clearly suggest he had an intent to cause injury. Indeed, the entire set of circumstances that night contribute to this conclusion. When he first left his house Miles armed himself with the hammer in anticipation of violence. His comment that he did not want to be the one lying on the floor also suggests that he anticipated that someone might get injured. Immediately before the attack, Miles had been arguing with Summerfield, and then abruptly asked Carey if he could use the bathroom. While in the bathroom, Miles removed the hammer from the pocket of his jacket. Immediately after exiting the bathroom, Miles encountered Summerfield standing near the bathroom doorway. Miles walked up to Summerfield as close as two feet. Exhibit 8, at p. 10. During the interview with the State Farm agent, Miles pointed out not only that he was within two feet of Summerfield but also that the likelihood of hitting Summerfield was increased due to the length of the hammer.

Q. [W]hen you swung the hammer, how far away from him were you?

A. [M]aybe two feet.

Q. So if you would stretch your arm out you were in ...

A. Yea.

Q. In a way going to be able to hit him?

A. Well the length of the hammer also.

Exhibit 8, at 10.

These factual circumstances lead me to the finding that Miles, in swinging the hammer, intended to cause some injury.

■ The defendants raise the affirmative defense of legal insanity.[5] To be entitled to summary judgment, State Farm must also demonstrate that there is no genuine issue of fact with respect to this affirmative defense. This, however, is not difficult to do because of the legal presumption that all persons are sane until proven otherwise. *Rush v. McGee*, 36 Ind. 69 (1871). Indeed, even without the benefit of this presumption, State Farm could meet its burden by simply asserting that the defendants lack any evidence of insanity. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552 (when the party moving for summary judgment does not bear the burden of proving a particular issue at trial, the moving party need not present affirmative evidence on that issue at the summary judgment stage, but may instead simply assert its opponent's lack of evidence).

Because State Farm has met its initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party defendants must now "set forth specific facts showing that there is a genuine issue for trial" if they hope to avoid an adverse summary judgment decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d 202 (1986). In order to avoid summary judgment, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury

5. In *West American Ins. Co. v. McGhee*, 530 N.E.2d at 112, Indiana adopted legal insanity as a defense to an insurance exclusionary clause. The defendant, of course, bears both the burden of production and the burden of persuasion with respect to this defense because all persons are presumed sane until proven otherwise.

*Rush v. McGee*, 36 Ind. 69 (1871). In order to prevail on this defense at trial, the defendants must prove by a preponderance of the evidence that Miles was insane at the time he struck Summerfield. *Turner v. Estate of Turner*, 454 N.E.2d 1247, 1248–49 n. 2 (Ind.Ct.App.1983).

or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). The defendants have attempted to raise a genuine dispute by arguing that Miles was legally insane at the time of the act, and therefore was incapable of intentionally causing injury.

There are four basic tests for insanity[6]: the Durham test, the Mc'Naghten test, the irresistible impulse test, and the ALI test. All four tests have been used at various times throughout history and within different contexts. For example, within the context of criminal law, Indiana has applied both the ALI test, in *Hill v. State*, 252 Ind. 601, 251 N.E.2d 429, 436–37 (1969), and a version of the Mc'Naghten test, in Indiana Code § 35–41–3–6 (Burns 1985).[7]

Within the context of insurance exclusionary clauses, Indiana appears to have adopted a watered down version of the irresistible impulse test in *West American Ins. Co. v. McGhee*. According to the *McGhee* court, proof of legal insanity requires "some evidence tending to prove that the actor was unable to conform his behavior to societal norms." 530 N.E.2d at 112 (citing *Globe American Casualty Co. v. Lyons*, 131 Ariz. 337, 641 P.2d 251 (App. 1981)).

In *McGhee*, the defendant's only evidence of legal insanity was that the act itself (double murder-suicide) was irrational. The *McGhee* court rejected the argument that this evidence could be sufficient to prove insanity on grounds that the "commission of an irrational act does not necessarily equate with legal insanity." 530 N.E.2d at 112. The court suggested that if the defendant had presented evidence

showing the actor had a history of mental illness, or if there had been expert testimony regarding the actor's insanity, then the trial court's judgment for the defendant might have been allowed to stand. But in the absence of any such evidence, the court refused to let the decision for the defendant/insured stand. *Id.*

■ Although *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires me to apply state law as it is interpreted by the courts of that state, I am not convinced that the *McGhee* case is the definitive Indiana statement of the law on this subject. *McGhee* does not explain well its reasons for preferring the irresistible impulse test over the other tests for insanity. In reaching its decision, the *McGhee* court looked to other states for guidance, specifically, the Arizona Supreme Court in *Globe American Casualty Co. v. Lyons*, 131 Ariz. 337, 641 P.2d 251 (App. 1981). While an examination of the law of sister states is to be encouraged for its own sake, the analysis should, at some point, take into account the law from one's own state. The *McGhee* court excluded from its opinion the Indiana Supreme Court's opinion in *Hill v. State*, 252 Ind. 601, 251 N.E.2d 429 (1969), the Indiana statute on mental insanity, Ind.Code § 35–41–3–6 (Burns 1985), and the various definitions of mental illness contained in those parts of the Indiana Code that establish state psychiatric hospitals, Ind.Code §§ 16–14–1–1 & –9.1–1 (Burns 1983). In addition, the formulation of the irresistible impulse test that the *McGhee* court enunciates is a substantial alteration of the test put forward by the Arizona Supreme Court in *Lyons*, yet the *McGhee* court makes no attempt to explain the reason for the alteration. *Compare McGhee*, 530 N.E.2d at 112, *with Lyons*, 641 P.2d at 254. Notwith-

---

6. See *Hill v. State*, 252 Ind. 601, 251 N.E.2d 429 (1969), *Wade v. United States*, 426 F.2d 64, 82–84 (9th Cir.1970) and the cases and law review articles cited therein for an extended discussion of these four tests.

7. Indiana Code § 35–41–3–6 (Burns 1986) reads: (a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to ap-

preciate the wrongfulness of the conduct at the time of the offense. (b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

standing my own reservations concerning the correctness and persuasiveness of the *McGhee* opinion, I am duty-bound to apply the test put forward by that court.

Unlike *McGhee*, there is not a total absence of evidence on this issue in this case. Although the defendants have not presented any history of Miles' mental insanity, they have presented the deposition testimony of an expert witness, Dr. Rodney Caudill, in an attempt to establish a genuine dispute over whether Miles lacked the ability to conform his behavior to societal norms. As *Anderson v. Liberty Lobby, Inc.* instructs, I must examine this evidence to determine not whether Miles, in fact, lacked this ability, but whether there is a large enough body of evidence on which a jury could reasonably base a verdict for the defendant. 477 U.S. 242, 106 S.Ct. 2505. Considering all the evidence produced by the defendants on this point in a light most favorable to them, I believe that they have failed to raise a genuine dispute.

To facilitate the discussion that follows, those portions of Dr. Caudill's testimony recited in the parties' briefs are reproduced in entirety here:

Q. I'd now like to ask you a few questions to get your reaction about Mr. Miles and why he acted the way that he did when he struck Mr. Summerfield?

A. Okay. I believe that the intensity of his relationship with Sheila and the magnitude of the threat of loss connected with her relationship with Dennis and his accumulating emotional doubts about himself connected with school, connected with work, connected with his future, I believe that these amounted to an extraordinary distress upon his control under the circumstances of seeing this handsome devil ensconced with his fiancee. And just one step that Dennis made toward him was sufficient threat of all this loss, that he felt he was actually protecting himself and his loved one. So there was this momentary loss of impulse control that was strictly momentary.

Q. Did you find that act to be out of character for Mr. Miles?

A. Not out of character for a good baseball catcher throwing a strike down to second base when the runner is trying to steal.

Q. Do you think that at that moment that his judgment and insight were affected?

A. Well, at that moment, I don't think he was using any judgment. I think he was ruled by impulse.

Q. And he simply lacked the power to resist that impulse at that moment in time?

A. It mastered him.

      *     *     *     *     *     *

Q. Do you think that at the time that he struck Mr. Summerfield that he had the capacity to govern his conduct in accordance with reason?

A. No, I thought at that moment his sense of reason was lost.

Q. Do you think that he formulated a specific intent to hurt Mr. Summerfield?

A. He had no sense of intent, and at the moment afterwards he was—he felt no malice or no relief from a sense of vengeance even.

Q. Do you think at that moment in time that he was capable of distinguishing right from wrong?

A. He knew it was wrong afterwards.

Q. Do you think immediately prior to hitting Mr. Summerfield that he appreciated—

A. Well, he didn't even expect that it was going to happen. If he had expected it to happen, he would have known it was wrong.

Q. But his though process hadn't even developed to that stage?

A. Right. He had even forgotten that he had had that hammer with him.

Q. Do you know where about him he had that?

A. I assume that he had had it in some heavy coat, but I can't be specific about that. In a deep pocket of a heavy coat of some kind. Right after he went to the apartment, I remember he had to go to the bathroom, and when he was in the bathroom, he felt the thing. Let's see,

then he even said what did I bring this for? He had forgotten.

Q. Given his emotional state at that time, did you consider that unusual that he would have forgotten that?

A. No. It was not unusual because when he grabbed it, he had no intent. I better protect myself, something like that.

Q. Do you know precisely what the gesture was that Mr. Summerfield made to trigger that?

A. Just a step toward him. That was all. Of course there were words going on at the time, too. I guess Sheila being a little too gutsy allowed him to really feel completely rejected.

Q. You had no indication, did you, Doctor, that on that evening that he had planned out this particular attack on Mr. Summerfield before it happened?

A. Had no evidence that he had any preconceived notion whatsoever.

\* \* \* \* \* \*

Q. In your early diagnosis of Bill's problems and then apparently from your testimony as you counseled with him you reconfirmed that your earlier diagnosis was correct. Was there in your opinion anyone around Bill that was capable of being able to detect that he was starting to have some problems at that particular point in time; in other words, were there any telltale signs that someone—

A. Only Sheila, and I think Sheila was pointing out to him that he wasn't sleeping; that he was having trouble in school. Sheila was aware, but that was it.

Q. He was living at home, was he not, leading up to this event with his parents?

A. Right.

Q. So far as his behavior was concerned then in your opinion, nothing short of some expert perhaps noticing, probably his condition was not that noticeable?

A. Oh, no. He probably appeared cool, calm and collected.

Q. We hear the term character disorder sometimes being used. Did Bill suffer from any kind of character disorder?

A. No, Bill has a fine character. He lived up to his principles. He needed them loosening up.

Q. The use of the term which we hear from time to time sudden heat, heat of passion, acting out in the heat of passion, from your description of what occurred that night, his sudden act of violence I suppose, was that within that realm of sudden heat or heat of passion?

A. Sure. In the olden days we would have called this the irresistible impulse.

Deposition of Dr. Rodney Caudill, at p. 27, 1. 17 to p. 29, 1. 1; and p. 29, 1. 12 to p. 31, 1. 13; and p. 34, 1. 20 to p. 36, 1. 8.

Dr. Caudill is a psychiatrist in private practice who treated Miles from January 13, 1986 to May 1986. After taking Miles' history, which has already been laid out within this memorandum, Dr. Caudill concluded that Miles was suffering from separation anxiety, atypical depression [8] and an identity crisis, but that he was not suffering from any psychosis [9] or any character disorder. Deposition of Dr. Rodney Caudill, at 11, 19 & 34–36.

■ Dr. Caudill's testimony has two main thrusts to it, neither of which are relevant in this motion for summary judgment. First, Dr. Caudill's testimony suggests that Miles was acting in self-defense against Summerfield, who was perceived by Miles as a threat to himself and his relationship with Carey. Deposition of Dr. Rodney Caudill, at 27–29. As already discussed, actions in self-defense are not necessarily unintended. *See supra* at 1467.

Second, Dr. Caudill suggests that Miles acted in the heat of passion in striking Summerfield. *Id.* at 34–36. Simply because an act is committed in the heat of passion, however, does not render it unintentional. Indeed, conviction for voluntary manslaughter (heat of passion killing) in

**8.** Dr. Caudill testified that atypical depression is depression that is also accompanied by anxiety. Deposition of Dr. Caudill, at p. 11, 1. 22–23.

**9.** Dr. Caudill defined "psychosis" as "a break with reality, a break with reason, a retreat from society...." *Id.* at 19, 1. 6–7.

**1472**

Indiana requires the state to prove a knowing or intentional killing. Indiana Code § 35–42–1–3 (Burns Supp.1989). Intent to kill under this statute, like intent to cause injury in this case, can be proved by an inference drawn from the circumstances surrounding the act. *Rowan v. Owens,* 752 F.2d 1186 (7th Cir.1984) (intent to kill can be inferred from fact that defendant struck heavy blow to the head of an elderly woman), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 691 (1986). In Indiana, the fact that a battery was committed in the heat of passion will not reduce the action to a lesser charge. *But compare Mason v. Virginia,* 7 Va.App. 339, 373 S.E.2d 603 (1988) (battery, termed "malicious wounding" under Virginia statute, may be reduced to the lesser offense of "unlawful wounding" upon showing that defendant acted in heat of passion).

To the extent that the doctor's testimony addresses these two points, it is irrelevant to the material issues of the case. Defendants cannot avoid summary judgment by utilizing the doctor to raise a genuine dispute over whether Miles acted in self-defense or in the heat of passion. In shot, neither of these issues are material to the case.

Dr. Caudill's statements do, at times, focus more accurately on Miles' sanity at the time of the attack. This testimony, however, is not adequate to raise a genuine issue of material fact. Most of Dr. Caudill's statements with respect to Miles' sanity and intent are vague, colloquial, and could be generally categorized as "mealy-mouthed." *See Backes v. Valspar Corp.,* 783 F.2d 77, 80 (7th Cir.1986) ("the wording of the affidavit [by the plaintiff's expert witness] is rather mealy-mouthed"). Dr. Caudill's most direct statements that support the defendants' defense are the bald assertions that Miles had "no sense of intent," Deposition of Dr. Rodney Caudill, at 29–30, and that "he was ruled by impulse." *Id.* at 27–29. When evaluated under the light of the Supreme Court's opinion in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510, I believe that this evidence is, at best, only colorable, and is not sufficient for a jury to return a verdict for the defendants.

On alternative grounds, I do not believe that summary judgment can be avoided merely by presenting the conclusory testimony of an expert witness. Under Fed.R. Civ.P. 56(e), the party opposing summary judgment must present *specific* facts showing that there is a genuine issue for trial. Although Dr. Caudill invokes some of the "magic words" normally associated with a diagnosis of insanity, there is no factual basis to support the conclusion that Miles was insane at the time of the attack. Indeed, Dr. Caudill himself concluded that Miles was not suffering from any psychosis. Deposition of Dr. Caudill, at 19, lines 3–4.

In *Evers v. General Motors Corp.,* the Eleventh Circuit held that "conclusory allegations without specific supporting facts have no probative value." 770 F.2d 984, 986 (11th Cir.1985) (unsupported legal and factual conclusions in affidavit of automobile design expert were inadequate to avoid summary judgment against plaintiff). *Cf. Powers v. Dole,* 782 F.2d 689, 694–95 (7th Cir.1986) and *Mason v. Continental Ill. Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983) (within context of employment discrimination suits, conclusory allegations regarding intent that have no factual support are insufficient to create a genuine issue of material fact). The *Evers* case has been cited with approval by district court judges within the Seventh Circuit. *See Mid–State Fertilizer v. Exchange Nat'l Bank of Chicago,* 693 F.Supp. 666, 670 (N.D.Ill.1988) (financial expert's conclusions, based only on review of pleadings, depositions and documents in the case, without a recitation of specific facts or steps in his reasoning that led him to the conclusion, are insufficient to avoid summary judgment); and *Story v. Latto,* 702 F.Supp. 708, 709 (N.D.Ill.1989) (bald conclusion of expert cannot alone avoid summary judgment). *But see Bulthuis v. Rexall Corp.,* 789 F.2d 1315 (9th Cir.1986) (expert opinion unsupported by recitation of underlying facts may avoid summary judgment).

If summary judgment can be avoided simply by presenting the unsupported opinion of an expert witness, it would be virtually impossible for a court to grant summary judgment as long as the non-moving party could locate a sole expert who was willing to create a genuine issue of material fact for a price. *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir. 1977). This is not, I believe, a proper interpretation of the law governing summary judgment.

The Seventh Circuit's opinion in *Backes v. Valspar Corp.*, 783 F.2d 77 (7th Cir. 1986), is not contrary to this interpretation of Rule 56. In that case, the Seventh Circuit held that a court may base a denial of summary judgment in part on an opinion rendered by a chemist on the cause of illnesses even though the chemist is not a medical doctor. That case focused on the *competency* of an expert witness to testify as to a particular factual conclusion, not on the ability of an expert to render a conclusion that was unsupported by underlying facts. Indeed, in *Backes*, the chemist had a broad base of objective facts on which to base his opinion. *Id.* at 78. Nor was the *Backes* case about the ability of a party to avoid summary judgment merely by presenting the conclusions of a sole expert witness. There was a large body of evidence beyond the chemist expert's testimony to create a genuine issue of material fact as to whether a causal link existed between the defendant's release of lead into the environment and the plaintiff's children's illnesses. *Id.* at 80–81. Although *Backes* is an important case in its own right, it has no application to the issues decided in this case.

Let there be no mistake. I am not basing this decision on the competency of Dr. Caudill. His credentials are more than adequate to permit him to render an opinion on a person's mental health. Nor am I concluding that Dr. Caudill failed to perform any particular mental health test on Miles. On the contrary, Dr. Caudill did perform "a verbal WAIS with mental status examination." Deposition of Dr. Caudill, at 13, lines 12–15. The doctor has an adequate educational and professional background and an adequate factual basis from which to render an opinion about Miles' mental health. I do not believe, however, that I am bound by that opinion simply because it comes from the mouth of an expert. The facts on which that expert relies must be presented to the court, and those facts must indeed support the expert's opinion.

To summarize, the testimony of Dr. Caudill fails to raise a genuine issue of material fact. It fails because it focuses primarily on the irrelevant issues of self-defense and heat of passion. To the extent that material issues are addressed, the testimony is too insignificant to justify a verdict for the defendants. On alternative grounds, I believe that even a strongly asserted expert opinion that Miles was mentally insane at the time of the attack would not be enough, by itself, to avoid summary judgment. In addition, I would need to see the factual basis for this opinion, and those facts would have to support the opinion.

The ultimate result is that the defendants have failed to establish a genuine issue of fact concerning Miles' intent and sanity at the time of the act. Without this issue in dispute, there remains no material fact to be decided. State Farm is entitled to summary judgment as a matter of law.

### Conclusion

As discussed above, there is no dispute as to a genuine issue of material fact. Miles intentionally swung the hammer at Summerfield, with the intent of causing some injury to Summerfield. He was not insane at the time of his attack. As a result of these facts, the exclusionary clause cuts off State Farm's obligation to defendants Summerfield and Miles. State Farm is entitled to summary judgment as a matter of law.

### JUDGMENT

The court, having this day filed its Entry in the above captioned matter, in accordance therewith, now GRANTS the Motion for Summary Judgment of the plaintiff, State Farm Fire and Casualty Company.

**1474**

IT IS THEREFORE ORDERED, DE-CREED AND ADJUDGED that State Farm Fire and Casualty Company has no obligation under the homeowners insurance policy # 14–920134–6 held by John and Carol Miles to pay any damages, losses or injuries resulting to Dennis P. Summerfield and arising from the actions of William E. Miles during the incident which occurred on or about December 29, 1985. It is further ordered and decreed that judgment in this cause be entered in favor of the plaintiff, State Farm Fire and Casualty Company, and against the defendants, William E. Miles and Dennis P. Summerfield.