61 F.3d 905
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
GULF INSURANCE, Plaintiff/Counter-Defendant/Appellee,
v.
Roy E. KINGMAN, Kingman Leasing Incorporated, David
Hinegardner and Sherry Hinegardner,
Defendants/Cross-Defendants/Appellees,
v.
JOY TRUCK LINES, INCORPORATED, and Northland Insurance
Company,
Defendants/Counter-Claimants/Cross-
Claimants/Appellants.
 No. 94-3437.
 United States Court of Appeals, Seventh Circuit.
 Argued May 15, 1995.
Decided July 20, 1995.
 
 Before CUMMINGS, BAUER and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 On Sunday June 30, 1991 a Peterbilt semi-tractor driven by William Webber, owned by Kingman Leasing, Incorporated ("Kingman") and leased to Joy Truck Lines, Incorporated ("Joy") collided with the Hinegardner family's Pontiac on U.S. Highway 33 in South Bend, Indiana. At the time of the accident the Peterbilt tractor was "bobtailed"--that is, it was being driven without a trailer. The issue in this appeal from a declaratory judgment suit brought by Kingman's insurer, Gulf, is whether or not the tractor was being used in the business of the lessor, Joy, at the time of the collision.
 
 Background
 
 2
 On June 26, 1991, Kingman and Joy executed a one-year lease agreement for the Peterbilt tractor. The agreement gave Joy "exclusive possession, control and use of the equipment for the duration of this lease." Kingman agreed to indemnify and hold Joy harmless with respect to claims arising out of the operation of the tractor. Kingman also supplied its newly hired employee, William Webber, to drive the tractor. Joy approved Webber as the driver, familiarized him with the company's policies and supplied him with its driver handbook.
 
 
 3
 Pursuant to his second assignment under the lease, Webber picked up 86 rolls of carpet in Dalton, Georgia, on Friday June 28, 1991. He was to deliver the carpet to the Chicago area, a trip of about 12 hours, on Monday July 1. Webber was instructed to make his first delivery in Chicago Monday at 8 a.m. He was not specifically instructed how or where to spend the weekend. He was, however, instructed by both Joy and Kingman that he was not to take the tractor home.
 
 
 4
 Webber's trip took him through South Bend, where he lived. Kingman had an arrangement whereby drivers arriving in South Bend during evening hours could leave their trailers at the Dallas and Mavis truck yard ("Dallas and Mavis") which was about half a mile from the Kingman facility and had a 24-hour guard. Drivers were instructed that after leaving their trailers, they were to drive the tractors bobtail to the Kingman facility and leave them within the locked gate. Drivers were usually given keys to the lot for this purpose and a toll-free number to call after hours in case of a problem.
 
 
 5
 Webber arrived in South Bend early on the morning of Saturday, June 29. He left the trailer at Dallas & Mavis as instructed. He was apparently without a key and therefore unable to enter the Kingman facility and did not leave the tractor in the lot. In the afternoon of Sunday June 30, while the trailer with the carpet was still undelivered and parked at Dallas & Mavis, the leased Peterbilt, driven by Webber, collided with the Hinegardners' Pontiac on Highway 33.
 
 
 6
 Joy had obtained a standard truckers' policy from Northland Insurance Company ("Northland") that provided primary coverage for Joy and any permissive user so long as the vehicle was being used in Joy's business pursuant to its I.C.C. operating authority. The policy provided excess coverage where the vehicle was hired or borrowed by another trucker. Kingman was covered under a non-trucking liability policy issued by Gulf Insurance ("Gulf").
 
 
 7
 Gulf brought the present action seeking a declaratory judgment that Kingman's non-trucking liability policy provided no coverage for claims arising from the Hinegardners' suit. Northland and Joy cross-claimed against Kingman and the Hinegardners seeking a declaration that Joy's policy with Northland provided no coverage for the Hinegardners' claims. Finally, Joy and Northland counter-claimed against Gulf seeking a declaration that Gulf was the primary insurer and had a duty to defend and indemnify Webber, Kingman and Joy.
 
 
 8
 On cross-motions for summary judgment, the district court ruled in favor of Gulf after refusing to consider a transcript of an interview with Webber offered by Joy and Northland. The court found no coverage under Gulf's policy because the tractor was being operated in the business of Joy at the time of the accident. Gulf, therefore, had no duty to defend or indemnify Kingman, Webber or Joy.
 
 
 9
 On appeal, Joy and Northern argue that the tractor was not being operated in the business of Joy and that the district court abused its discretion in not admitting the Webber transcript.
 
 Discussion
 
 10
 I. District court's refusal to consider transcript of William Webber interview
 
 
 11
 Don Dalrymple, vice president of Joy, conducted an investigation of the accident less than 48 hours after its occurrence. As part of that investigation he interviewed William Webber, who had just been fired by Kingman. Also present during the interview were Roy Kingman and an independent adjuster hired by Northland who recorded and transcribed the interview.
 
 
 12
 In the transcript, Webber gave the following account of his activities before the accident. After dropping the trailer at Dallas and Mavis, Webber was unable to enter Kingman's lot to leave the tractor. He then called Kingman's toll-free number and reached a Kingman employee who gave him permission to take the tractor home. Webber took the tractor home and returned to the Kingman facility at 9 the next morning. Finding the lot still locked, he returned home, picked up his young son, and drove to his brother's house in Michigan to collect a debt. The accident occurred on his way home from his brother's home when he turned left in front of the Hinegardners' Pontiac. He was arrested at the scene after registering a blood alcohol level .20, twice the legal limit. He admitted in the interview to drinking three beers in the previous six hours.
 
 
 13
 In response to Gulf's motion for summary judgment, Northland and Joy submitted a copy of the transcript of the interview along with an affidavit from Roy Kingman describing its circumstances. The district court refused to consider the transcript, finding that it did not fit any exception to the hearsay rule. We review the district court's evidentiary rulings for abuse of discretion and will reverse only where "no reasonable person would have agreed with the district court." Holmes v. Elgin, Joliet & Eastern Railway Co., 18 F.3d 1393, 1397 (7th Cir. 1994).
 
 
 14
 Northland and Joy first argue that the transcript is admissible as a business record under Fed.R.Evid. 803(6). This rule in part allows for the admission of:
 
 
 15
 A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation ***
 
 
 16
 In this case, the transcript contains double hearsay. Therefore Joy and Northland must establish that both declarants--the record maker and Webber--were acting in the ordinary course of business. See United States v. Emenogha, 1 F.3d 473 (7th Cir. 1993).
 
 
 17
 They fail at both levels. First, the interview was transcribed by an independent insurance adjuster, not in the ordinary course of Joy's business; thus it was not a business record of Joy. Even if Joy had recorded the interview and prepared the transcript, the taking of statements during the investigation of an accident is not part of the normal course of the trucking business. Palmer v. Hoffman, 318 U.S. 109.
 
 
 18
 At the second level, the district court correctly found that Webber was under no business duty to make the statements in the transcript, since he had already been fired by Kingman. And even if he still had a business duty to Joy, driving trucks--not making statements about accidents--was Webber's "regularly conducted business activity." Therefore the district court did not abuse its discretion in holding that the interview transcript was not admissible as a business record.
 
 
 19
 Because Webber has disappeared, Joy and North sought admission of the transcript under Fed.R.Evid. 804(b)(5), the "catch-all" exception where the declarant is unavailable as a witness. That exception provides in pertinent part:
 
 
 20
 (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 
 
 21
 * * *
 
 
 22
 * * *
 
 
 23
 (5) Other exceptions. A statement not covered by any of the foregoing exceptions, but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
 
 
 24
 The district court found that Webber's statements do not fit the exception because they lacked "equivalent circumstantial guarantees of trustworthiness." The court based its determination on an analysis of the seven factors previously set forth by this Court:
 
 
 25
 (1) the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; (2) whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; (3) the witness' relationship with both parties and his motivation to testify ...; (4) the extent to which the witness' testimony reflects his personal knowledge; (5) whether the witness ever recanted his testimony; (6) the existence of corroborating evidence; and (7) the reasons for the witness' unavailability.
 
 
 26
 United States v. Seavoy, 995 F.2d 1414, 1418 (7th Cir. 1993) (citation omitted), certiorari denied, 114 S. Ct. 407. The district court found that the first three factors weighed heavily against admission and the last four were inconclusive. The court noted that there was no evidence of Weber's character for truthfulness or honesty; the testimony was not given voluntarily but in response to often leading questions; Webber was not under oath and there was no opportunity for cross-examination; and the interview was taken under hostile circumstances, Webber having just been fired. While we might quibble with some parts of the district court's analysis[1] and even with its decision to exclude the transcript given the absence of other probative evidence, we cannot say that the district judge reached a decision with which no reasonable person could agree.
 
 II. Coverage under Gulf's policy
 
 27
 After excluding the Webber transcript, the district court granted summary judgment for Gulf, finding no coverage under the non-trucking liability policy. Based on the admissible evidence, the district court found that the tractor was being used in the business of Joy at the time of the accident.
 
 
 28
 For the first time in their reply brief, Joy and Northern argue that because Gulf is seeking to avoid coverage under a policy exclusion, it had the burden of proving the applicability of the exclusion. Because Gulf presented no evidence as to Webber's actual purpose or destination at the time of the accident, Joy and Northern contend, Gulf failed to carry that burden.
 
 
 29
 As pointed out by Gulf at oral argument, by not raising it below or even in their initial brief before this Court, Joy and Northern have waived this argument. In any event, this contention is unavailing. It is generally true in insurance coverage disputes that once an insured establishes facial coverage under an insurance policy, the insurer has the burden of going forward with evidence sufficient to show the applicability of the exclusion. Snodgrass v. Baize, 409 N.E.2d 645, 647 (Ind. App. 1980). It is not clear, however, how this rule applies in the instant case. Gulf is not attempting to invoke a hidden exclusion in a facially general policy. The insurance at issue here is standard in the industry and is purchased for a specific and limited purpose made clear by the title of the endorsement: "TRUCKERS-INSURANCE FOR NON-TRUCKING USE." Where the non-trucking use exclusion defines the scope and purpose of the coverage, see Hartford Ins. Co. v. Occidental Fire & Cas. Co., 908 F.2d 235, 239 (7th Cir. 1990), it is far from obvious that the burden should be on the insurer rather than the insured since non-trucking use must be established before facial coverage under the policy can be obtained. Joy and Northern have cited no non-trucking liability cases in which the burdens have been allocated explicitly according to their proposed rule.
 
 
 30
 Regardless, the district court correctly determined that Gulf carried its burden of proof. The court based its determination on the following undisputed facts: (1) the tractor was under lease to Joy, (2) the tractor and driver were under dispatch at the time of the accident, (3) the accident occurred before Webber had completed his delivery to Chicago while the carpet was still entrusted to him, (4) Joy knew that Webber would be in possession of the tractor over the weekend, (5) Joy had the authority to control Webber while he was under dispatch (6) Joy acknowledged that some "bobtailing" by Webber would be within the scope of its business.
 
 
 31
 Joy and Northern have not cited a single case in which a trucker who was under dispatch and had yet to deliver his load was held not to be in the business of the lessee. Two of this Court's cases are illuminating. In Hartford Ins. Co. v. Occidental, 908 F.2d 235 (7th Cir. 1990), this Court, applying Wisconsin law, held that a trucker was in the business of the lessee when he collided with another car on his way from a truck stop where he had been staying while his trailer was being repaired.
 
 
 32
 In Liberty Mutual Insurance Company v. Connecticut Indemnity Company, et al., F.3d , slip op. No. 94-3007 (7th Cir. June 7, 1995), a trucker was under dispatch with a load of breakfast cereal from Michigan to be delivered in Ohio on Monday. On Sunday, the trucker left his trailer in a truck stop in Jamestown, Indiana, logged himself off duty and drove bobtail to his home in Angola, Indiana. On Monday, he set out from Angola to pick up his load when he was involved in an accident. This Court, applying Indiana law, held that the trucker was acting in the business of the lessee even though he was off duty and returning from a weekend layover at home. The Court found dispositive (1) the trucker's responsibility for the load at the time of the accident and (2) the lessee's ultimate authority to direct the trucker's actions, even though not specifically exercised. In discussing the Hartford case the court noted that "[W]hat matters is that, when the accident occurred he was in the middle of carrying out his dispatch orders, the company to whom he leased his services had the right to control his actions and he was responsible for the [load]." Id. at 11. The same is true here.
 
 
 33
 Admittedly, in both of those cases the driver's purpose and destination at the time of the accident were known and undisputed and in both cases the driver was on his way to pick up his load to continue on his route. It cannot be determined from the admissible evidence whether or not Webber was doing the same. But with no admissible evidence to the contrary, the fact that Webber and the tractor were under lease and dispatch and standing by to complete delivery sufficiently establishes that Webber was acting in the business of Joy. Without any evidence to support it, Joy and Northland's contention that Webber was on a personal frolic is mere speculation and insufficient to preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (a dispute about a material fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party).
 
 
 34
 In attempting to show that Webber was not acting in the business of Joy strictly by introducing the Webber interview, Joy and Northland put all of their eggs in one very precarious basket. Assuming the events described in the Webber transcript occurred, Joy and Northern could have introduced additional non-hearsay evidence that Webber was indeed on a personal frolic: police reports, affidavits from witnesses, or other testimony regarding Webber's destination, his intoxication, or the presence of his young son. They did not. "Cases such as this one are won by attention to detail and completeness in the litigation of the summary judgment motion in the district court; they cannot be won in this court when the appropriate record has not been made." Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 448 (7th Cir. 1994). Appellants' fate was sealed by their failure to make the appropriate record before the district court.
 
 
 35
 Summary judgment is, therefore, affirmed.
 
 
 36
 ROVNER, Circuit Judge, dissenting. I respectfully dissent.
 
 
 37
 I have some reservation as to the decision to exclude the investigatory interview of Webber. Because the interview was recorded, there is no doubt as to what Webber actually said. Moreover, it would not appear to have been in Webber's interest (pecuniary, penal, or otherwise) to confess that he was bobtailing about Michigan and Indiana on personal business in a state of intoxication with his young son in the truck with him. Nonetheless, Webber answered the questions put to him, and although the interrogation may often have been leading, I would not characterize his testimony as involuntary. See ante at 5. At the same time, given that Kingman had already fired him, Webber had little apparent motive to tell a story that would be favorable to the interests of either Joy or Northland. See id. & n. 1 Even so, I recognize the considerable discretion that the district court enjoys on evidentiary matters (United States v. Edwards, 47 F.3d 841, 843 (7th Cir. 1995); United States v. Brown, 7 F.3d 648, 651 (7th Cir. 1993)), and I agree that Northland and Joy had other means of establishing the facts elicited in the interview of Webber. See ante at 7.
 
 
 38
 Even with the interview out of the picture, however, I believe that reversal is required because the undisputed facts of record do not establish that Webber was driving the tractor in furtherance of Joy's business at the time of the accident. It would seem to me beyond question that Gulf, as an insurer invoking an exception to coverage, bears the burden of establishing the facts necessary to render the exception applicable. E.g., State Farm Fire & Cas. Co. v. Miles, 730 F. Supp. 1462, 1466 (S.D. Ind. 199), aff'd without published op., 930 F.2d 25 (7th Cir. 1991); Rozek v. American Family Mut. Ins. Co., 512 N.E.2d 232, 234 (Ind. App. 1987); Evans v. National Life Accident Ins. Co., 467 N.E.2d 1216, 1217-18 (Ind. App. 1984). The majority suggests that Gulf might be relieved of this burden to the extent that the exclusion is not "hidden" but, in fact, "defines the scope and purchase of the coverage." Ante at 6. I know of no case which so holds, however, and the majority cites none.[1] Indeed, that novel proposition, were it to gain a foothold in the law, would only complicate coverage disputes with preliminary skirmishes as to whether the exclusion at issue is obvious or obscure, exemplary of the policy's coverage or merely incidental to it. The majority reasons in any event that Joy and Northland have forfeited entirely any argument based on the burden of proof by having failed to raise it any sooner than their reply brief. Id. Perhaps they have, given the extremely limited application of the plain error doctrine to civil cases. See, e.g., Prymer v. Ogden, 29 F.3d 1208, 1214 (7th Cir.), cert. denied, 115 S. Ct. 665 (1994). But surely they have not waived an argument based on the most basic of the rules governing summary judgment -- that the party seeking summary judgment bears the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. See, e.g., Green v. Whiteco Indus., Inc., 17 F.3d 199, 201 (7th Cir. 1994); LaScola v. US Sprint Communications, 946 F.2d 559, 563 (7th Cir. 1991).
 
 
 39
 In the absence of the interview, what the record reveals about the use of the tractor at the time the accident occurred is very little. We do know, as the majority points out, that (1) the tractor was under lease to Joy, (2) both the tractor and Webber were under dispatch at the time of the accident, (3) it was within Joy's authority to command Webber while he remained under dispatch, (4) Webber had not yet completed delivery of the carpet shipment to Chicago, (5) Joy was aware that Webber would retain possession of the tractor over the weekend, and (6) some "bobtailing" by Webber was within the scope of Joy's business. Ante at 6. But we know little beyond this, particularly regarding Webber's purpose and destination at the moment of the accident. Despite the paucity of facts on this subject, the majority is content to hold, as a matter of law, that Webber was acting in the business of Joy because both he and the tractor were under the dispatch and control of Joy and the delivery had not yet been completed when the accident took place. Ante at 7. If that is an accurate statement of the law, then Webber might just as well have parked the trailer and departed for Disneyworld. As the majority itself acknowledges, our precedents on this subject have not deemed a driver to be acting in the business of the insured absent proof of the driver's purpose and destination at the time of the accident. Id.; see Liberty Mut. Ins. Co. v. Connecticut Indemnity Co., 55 F.3d 1333, 1337 (7th Cir. 1995) ("had [the driver] driven his semi-tractor to the Indianapolis Motor Speedway or to the Kentucky Derby that weekend, for example, [he] would have exceeded his authority under the lease and would not have been acting in the business of [the trucking company]"). With evidence on these key points missing, it is little more than a guess that Webber was acting in the business of Joy as he bobtailed about in the tractor; add in the fact that the accident occurred beyond the city limits of South Bend, miles from the Kingman facility, and that guess begins to look suspect. It is possible, as Gulf suggests, that Webber was on his way to or from refueling or picking up a replacement part for the truck. Gulf Br. at 8. It is just as possible that Webber was off on a frolic of his own.
 
 
 40
 If it were evident that Webber was en route to the Dallas & Mavis yard to retrieve the trailer when the accident occurred, then it might be appropriate -- and consistent with both Hartford Ins. Co. of the Southeast v. Occidental Fire & Cas. Co. of North Carolina, 908 F.2d 235 (7th Cir. 1990), and Liberty Mut. Ins., 55 F.3d 1333 -- to conclude that Webber was acting in the business of Joy. But not even that much is clear. Instead, the few facts of record permit contrary inferences as to whose interests Webber was serving when his tractor collided with Hinegardners' Pontiac. As a result, I believe summary judgment in favor of Gulf was particularly inappropriate. See Betaco, Inc. v. Cessna Aircraft Co., 32 F.3d 1126, 1138 (7th Cir. 1994).
 
 
 
 [1]
 It would seem, for instance, that hostility might weigh on the side of trustworthiness since the real danger would be a friendly collusive interview designed to let Northland and Joy off the hook
 
 
 [1]
 Hartford Ins. Co. of the Southeast v. Occidental Fire & Cas. Co. of North Carolina, 908 F.3d 235, 239 (7th Cir. 1990), cited ante at 6, merely notes that the exclusion at issue there helps to define the scope of coverage