**Manual PORTER and Phyllis Porter, Plaintiffs,**

**v.**

**WHITEHALL LABORATORIES, INC., American Home Products Corporation and the Upjohn Company, Defendants.**

**No. IP 88–1192–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 30, 1992.

Vernon J. Petri, Indianapolis, Ind., for plaintiffs.

Ralph A. Cohen, Ice Miller Donadio & Ryan, William P. Wooden, Katherine L. Shelby, Wooden McLaughlin & Sterner, Indianapolis, Ind., for defendants.

MEMORANDUM ENTRY DISCUSSING SUMMARY JUDGMENT ENTERED IN FAVOR OF DEFENDANTS WHITEHALL LABORATORIES, INC., AMERICAN HOME PRODUCTS CORPORATION AND THE UPJOHN COMPANY

TINDER, District Judge.

An essential element of each of Plaintiffs' claims against the three Defendants is that the Defendants' products (ibuprofen tablets) were in fact a cause of Plaintiff Manual Porter's injury, an acute renal failure. In their Motions for Summary Judgment, the Defendants asserted that Plaintiffs' evidence completely fails on the issue of causation. Plaintiffs are unable to overcome the challenge provided by Defendants' Motions. Based on the discussion of relevant legal principles, findings of fact and conclusions of law presented below, Defendants' Motions for Summary Judgment will be granted.

## BACKGROUND

Plaintiff Manual Porter ("Mr. Porter" or "Manual" [1]) fractured his left great toe on

---

1. Although the original Complaint named and called Mr. Porter "Manual," Plaintiffs have called Mr. Porter "Manuel" also and have taken the liberty of altering their caption of this matter to reflect their new spelling preference. Defendants have consistently called Mr. Porter

October 3, 1986; he sought treatment from his physician, Dr. Diana Wells. Dr. Wells sent Mr. Porter to Bloomington Hospital, in Bloomington, Indiana. At the hospital, Mr. Porter was treated by a Dr. Jones, who gave Mr. Porter Tylenol #3 for his pain and requested that he return on October 10 for surgery to set the toe. Mr. Porter had continuing pain in spite of the Tylenol and returned to Dr. Wells' office on October 4. Dr. Wells knew of no contraindications to Mr. Porter receiving Motrin or Vicodin; her nurse practitioner gave Mr. Porter samples of each pain reliever. Mr. Porter took fourteen Motrin tablets between October 13, 1986 and November 7, 1986. Between November 7 and November 18, Mr. Porter took approximately fifteen Advil tablets from a bottle of twenty-four tablets his wife had purchased for him. Mr. Porter never took more than one Advil tablet at a time or more than two tablets in any single day.

Other than his injured toe, Mr. Porter had no significant health problems prior to November 19, 1986. On that day he returned to Dr. Wells' office complaining of headache, vomiting and blurred vision. Based upon Mr. Porter's symptoms, Dr. Wells sent him to Bloomington Hospital for treatment by Dr. Richard Combs, a nephrologist. Tests run by Dr. Combs indicated that Mr. Porter was experiencing an end-stage renal failure from which he would not recover.

Mr. Porter was readmitted to Bloomington Hospital in January, 1987 for a renal biopsy. That biopsy revealed an anti-glomerular basement membrane glomerulonephritis ("anti-GBM") and a membranoproliferative glomerulonephritis ("MPGN"). These are types of rapidly progressive glomerulonephritis ("RPGN"). The glomerulus is the filtering unit of the kidney. Glomerulonephritis is an inflammation and disease of the glomerulus that causes decreased renal function; RPGN is a description of glomerulonephritis that refers to how rapidly the renal function decreases. There are different types of glomerulone-

phritis, each having its own cause, some of which are known and some unknown. Anti–GBM is an auto-immune reaction involving the glomerular basement membrane; MPGN is another kind of glomerulonephritis caused by an immune reaction. Anti–GBM RPGN is sometimes also known as crescentic anti-GBM RPGN. RPGN is a rare and serious disease, which leads to end-stage renal failure in a significant number of cases without any ibuprofen or other drug use.

There is a separate disease process in the kidney known as interstitial nephritis, which is an inflammation of part of the kidney known as the interstitium. Interstitial nephritis often occurs as a secondary result of glomerulonephritis; the glomerulonephritis is the cause of the secondary interstitial nephritis. Samples taken from Mr. Porter indicated that he experienced interstitial nephritis also.

Mr. Porter's medical records and biopsy have been examined by the following relevant persons: Dr. Combs, the nephrologist from Bloomington Hospital; Dr. William Dick, a nephrologist at Indiana University Hospital, Indianapolis; Dr. Fred Z. Ferris, a nephrologist at Jewish Hospital in Louisville, Kentucky; Dr. Francesco Del Greco, a nephrologist; David M. Benjamin, Ph.D., a clinical pharmacologist; Dr. Richard Muther, a nephrologist; Dr. Robert McClusky, a renal pathologist; and, Dr. John Niles, a nephrologist. Statements and opinions from these medical professionals, submitted in the form of affidavits and deposition testimony, form the basis for Plaintiffs' and Defendants' claims regarding whether ibuprofen caused Mr. Porter's acute renal failure.

Defendant Whitehall Laboratories, Inc. is a subsidiary corporation of Defendant American Home Products Corporation (collectively called "Whitehall Defendants"); they make an over-the-counter pain relieving drug known as Advil, which contains 200 milligrams of ibuprofen. Defendant The Upjohn Company ("Upjohn") makes a prescription strength drug known as Mot-

---

"Manual," as he was named in the caption of the Complaint. Instead of calling Mr. Porter "Man-

ual a/k/a Manuel," the Court will call him "Manual" throughout this matter.

rin, which contains between 400 and 800 milligrams of ibuprofen. Ibuprofen is a type of non-steroidal anti-inflammatory drug ("NSAID"), and has been available in the form of Motrin at least since 1975.

Manual Porter's treating nephrologists testified in their depositions that Mr. Porter' kidney failure was caused by RPGN and that the disease process responsible for his RPGN was anti-glomerular basement membrane disease. (Combs Dep. at 8, 12, 22–25; Ferris Dep. at 5–6; Dick Dep. at 12.) Every other nephrologist or other expert who examined Mr. Porter's medical data and physical evidence testified that Mr. Porter's acute renal failure was caused by RPGN. (Del Greco Dep. at 69; Benjamin Dep. at 134, 222; Muther Aff. ¶ 10; McCluskey Dep. at 127; Niles Dep. at 151, 188–89.)

Ibuprofen is in the class of drugs known to cause tubular and interstitial nephritis. (Jacobs Dep. Ex. 1; Muther Dep. at 63.) The renal effects of ibuprofen have been studied for years and have been the subject of numerous studies and peer review articles in the scientific literature. There is no evidence in the record that any scientific or epidemiological tests or studies concluded that ibuprofen causes anti-GBM or MPGN or any other kind of RPGN. (Muther Aff. ¶ 11; Combs Dep. at 27–28, 91; Dick Dep. at 15–16; Ferris Dep. at 28, 44; Jacobs Aff. ¶ 8; Benjamin Dep. at 166; Del Greco Dep. at 133–34, 43.) There have been no reported cases connecting glomerulonephritis and NSAIDs. (Dick Dep. at 89; Del Greco Dep. at 153–54.) There is no known literature, study or scientific evidence that interstitial nephritis can progress to or cause any kind of RPGN. (Benjamin Dep. at 169; Del Greco Dep. at 143.) Both Dr. Ferris and Dr. Del Greco stated that a temporal relationship alone does not pro-

vide scientific proof of an iatrogenic reaction. (Ferris Dep. at 54; Del Greco Dep. at 152.)

Given the complete absence of epidemiological studies, most experts stated that there can be no reasonable degree of medical certainty that ibuprofen caused Mr. Porter's acute renal failure. Pointing to the absence of medical literature, Dr. Dick stated that he could not provide the opinion that it was more likely than not that ibuprofen was *a* cause of Mr. Porter's renal failure. (Dick Dep. at 52–53, 57, 89.) After initially connecting Mr. Porter's disease to ibuprofen because of their temporal relationship,[2] Dr. Combs reevaluated his position after a literature search disclosed no reports of an association between ibuprofen and RPGN. (Combs Dep. at 91.) Dr. Ferris stated consistently that he did not know what caused Mr. Porter's crescentic glomerulonephritis. (Ferris Dep. at 85.)

Three other experts agreed that no studies show any causal relationship between ibuprofen and the type of acute renal failure experienced by Mr. Porter; notwithstanding, these experts postulated theories describing such a relationship. Dr. Ferris stated that was a "theoretical possibility" that ibuprofen "aggravated a kidney problem that might have independently or separately developed while [Manual] was taking some of these medications." (Ferris Dep. at 70–71, 89–90.)[3] Given that his alternative "aggravation theory" was merely a hypothesis—based solely on the temporal relationship (*Id.* at 73)—Dr. Ferris could not state to a reasonable degree of scientific probability that Mr. Porter would not have had a total renal failure in the absence of ibuprofen even if ibuprofen did aggravate an existing condition. (*Id.* at 92.) Dr. Benjamin stated his opinion that

---

**2.** Dr. Combs' diagnosis upon Mr. Porter's discharge on December 5, 1986 was acute renal failure secondary to ibuprofen. Dr. Combs noted that "The patient's both [sic] Ibuprofen reactions have both an interstitial and glomerular reaction and I believe this can explain all of his problems." (Combs Dep.Ex.A.) Dr. Combs' other written diagnoses noted that he believed ibuprofen caused Mr. Porter's acute renal failure. (*Id.*)

**3.** Dr. Ferris testified further that his "aggravation theory" would require a high exposure over a short period of time or a regular exposure over a long period of time. (Ferris Dep. at 93–94.) He postulated that it would take fifty to one hundred pills of 400 milligrams or more for any aggravation to occur. (*Id.*) The undisputed facts show that Mr. Porter took nowhere near that amount. (Manual Porter Dep. at 56–58.)

ibuprofen caused an unspecified kidney condition which progressed to RPGN in an unexplained manner, although he stated further that he knew of no study or data providing such a relationship and also demonstrated a general lack of knowledge of the diseases from which Mr. Porter suffered. (Benjamin Dep. at 168–170.)

While stating that medical studies and his own research on ibuprofen have provided no scientific support (Del. Greco Dep. at 107–09, 114), Dr. Del Greco stated his personal hypothesis that ibuprofen caused Mr. Porter's interstitial nephritis which then progressed to glomerulonephritis. (*Id.* at 75–80, 133–35, 43.) Dr. Del Greco agreed that there was no scientific proof for this theory, and that it was "a hypothesis, the proof of which remains to be made." (*Id.* at 146.) As with every other expert, Dr. Del Greco testified that Mr. Porter could have had the same condition whether or not he ever took ibuprofen. (*Id.* at 114.) Dr. Del Greco agreed that if Mr. Porter's RPGN was caused by ibuprofen, then it would be the first such case known to medical science. (*Id.* at 153–54.)

Plaintiffs' Amended Complaint for Damages is in four counts. Count I stated a products liability claim under Ind. Code § 33–1–1.5–3, alleging that the Defendants' [4] ibuprofen was defective and unreasonably dangerous. Count II alleged that the Defendants were negligent in failing to label their ibuprofen products to give reasonable warning of the danger to the kidney resulting from its ingestion. Count III stated a claim for deception under Ind. Code § 35–43–5–3. Count IV stated that Defendants knowingly or recklessly failed to make a disclosure of the dangers of the ibuprofen and that Mr. Porter relied on the non-disclosure when consuming Advil.

Defendants' Motions for Summary Judgment contend that the record in this matter fails to establish as a genuine factual issue whether ibuprofen is capable, in general, of causing anti-GBM, MPGN, or any other type of RPGN, or that ibuprofen caused Manual Porter's RPGN. Defendants' argue further that the record fails to establish as a genuine factual issue whether ibuprofen is capable, in general, of causing a change from interstitial nephritis to RPGN, or that ibuprofen caused such a change in Manual Porter. Defendants set forth arguments regarding other elements of Plaintiffs' claims; however, these need not be addressed because the law and facts are with the Defendants on the primary, dispositive issue of causation.

## DISCUSSION OF LEGAL ISSUES

### I. CAUSATION IS A NECESSARY ELEMENT OF EACH OF PLAINTIFFS' CLAIMS

Plaintiffs do not dispute that each of their claims requires a finding of fact that Defendants' ibuprofen was the legal cause of Mr. Porter's acute renal failure. Without a proved causal relationship, all causes of action connecting Mr. Porter's acute renal failure to ibuprofen fail for lack of an essential element. Plaintiffs' products liability claim places upon the claimant the burden of proving that "the defective condition was a proximate cause of the loss complained of." *Lantis v. Astec Indus., Inc.,* 648 F.2d 1118, 1120 (7th Cir.1981) (applying Indiana law); *Ortho Pharmaceutical Corp. v. Chapman,* 180 Ind.App. 33, 388 N.E.2d 541, 545 (1979). A party claiming injury from negligence bears the burden of proving an injury proximately resulting from the defendant's negligent acts. *Cowe by Cowe v. Forum Group,* 575 N.E.2d 630, 636 (Ind.1991). Plaintiffs must prove that Defendants' allegedly deceptive packaging is connected to Mr. Porter's injury; to recover for deception, Plaintiffs must prove that Mr. Porter's ingestion of ibuprofen caused his renal failure. Count IV of the Amended Complaint states that Defendants had a duty to disclose the fact that the "ingestion of Advil and Motrin (i.e.

---

4. The term "Defendants" refers to all three Defendants in this matter. Although a distinction between the Whitehall Defendants and Upjohn might have been important in some situations (e.g. if the timing or concentration of Manual's ingestion was an issue), the question here is whether *any* ibuprofen caused the injury. Thus, the three Defendants will be referred to collectively unless otherwise appropriate.

ibuprofen) could cause chronic kidney failure." (Am.Compl. ¶ 24.) Plaintiffs must prove that Defendants' ibuprofen caused Mr. Porter's injury after Mr. Porter ingested the drug in reasonable reliance on the non-statements.

A legal cause-in-fact is "that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the result complained of and without which the result would not have occurred." *Ortho Pharmaceutical*, 388 N.E.2d at 555. An event is a cause-in-fact of another event if the second event would not have occurred "but for" the first. *Collins v. American Optometric Ass'n.*, 693 F.2d 636, 640; *Cowe*, 575 N.E.2d at 635. Under Indiana law, the evidentiary standard required to establish the fact of causation in this matter is a preponderance of the evidence. *Watson v. Medical Emergency Serv. Corp.*, 532 N.E.2d 1191 (Ind.Ct.App. 1989) (trans. denied); *Yaney v. McCray Memorial Hosp.*, 496 N.E.2d 135 (Ind.Ct.App.1986).

Affirming summary judgment in favor of a drug manufacturer on the issue of causation, the Seventh Circuit held that a claimant "must demonstrate by a preponderance of the evidence a causal connection between [the drug] and [plaintiff's] alleged injuries in order to prevail under Indiana law." *Todd v. Merrell Dow Pharmaceuticals, Inc.* 942 F.2d 1173, 1179 (7th Cir. 1991). A claimant may not rely on an allegation of causation but must produce a preponderance of evidence establishing that fact. *City of Indianapolis v. Parker*, 427 N.E.2d 456, 461 (Ind.Ct.App.1981). Plaintiffs must prove that it is more likely than not that Mr. Porter's acute renal failure would not have occurred but for his ingestion of ibuprofen.

The first step in determining whether one event caused another is to develop a theory or hypothesis explaining the causal relationship between the two. Such a theory will usually involve one or more events, each event caused directly by its predecessor; these consecutive events form a "chain of causation." Plaintiffs responded to Defendants' challenges by asserting two alternative theories of causation linking ibuprofen to Mr. Porter's injury. Plaintiffs' first theory states that ibuprofen caused interstitial nephritis, which caused the acute renal failure itself "through the damage it was doing as it progressed." (Pls.' Resp. Whitehall Defs.' Mot.Summ.J. at 13.[5]) This first theory may be represented as follows:

Ibuprofen ==> Interstitial Nephritis ==> Renal Failure.

Plaintiffs' second theory of causation argues that ibuprofen first caused interstitial nephritis; the interstitial nephritis caused secondary medical problems, including RPGN, which then caused Mr. Porter's acute renal failure. (*Id.* at 13–14.) The second theory may be represented as follows:

Ibuprofen ==> Interstitial Nephritis ==> RPGN ==> Renal Failure.

## II. FACT OF CAUSATION MAY BE ESTABLISHED BY EXPERT TESTIMONY ONLY

Whether Mr. Porter's acute renal failure was an iatrogenic reaction to ibuprofen is a fact outside of the understanding of lay jurors. The etiology of Mr. Porter's renal failure is dependent upon complex medical interactions that are understood—to the extent they can be understood—only by specialists in the field of nephrology. A mere temporal relationship between Manual's ingestion of ibuprofen and his subsequent injury cannot form the basis for a reasonable finding of causation. Such a blunt inference cannot provide a

---

5. Plaintiffs failed to place page numbers on this document, which was filed under the former version of the Local Rules of the United States District Court for the Southern District of Indiana ("Local Rules"). Plaintiffs are directed to the new Local Rules, which provide that for each document filed in this Court "[e]ach page shall be numbered consecutively." S.D.Ind.L.R.

5.1. In addition, Plaintiffs' Brief in Opposition to Defendant Upjohn's Motion for Summary Judgment was bound with a plastic binder; Plaintiffs are directed to a Local Rule that has always provided that filings "shall be fastened together at the top left corner and at no other place." *Id.*

reasonably reliable explanation for complex, unseen physiological processes. While a temporal congruity may be *some* evidence of causation, it is insufficient evidence to move the merely possible to the reasonably probable. Any finding of the fact of causation based solely on facts within the understanding of lay jurors would be bald speculation.

Therefore, this matter presents a situation where expert testimony is not only helpful but absolutely necessary. "When the issue of proximate cause is not within the understanding of lay persons, testimony of an expert witness on the issue is necessary." *Watson*, 532 N.E.2d at 1194; *Yaney*, 496 N.E.2d 135. Questions of medical causation of a particular injury are "questions of science necessarily dependent on the testimony of physicians and surgeons learned in such matters." *Brown v. Terre Haute Regional Hosp.*, 537 N.E.2d 54 (Ind.Ct.App. 1989). Expert testimony seeks to provide the jury with a sufficient basis to make a reasonable finding on the issue of causation. Therefore, the focal issues in this matter are (1) whether expert testimony favorable to Plaintiffs' theories of causation is admissible and, (2) if admissible, whether that testimony provides a minimally sufficient basis from which a reasonable juror could find that ibuprofen caused Mr. Porter's acute renal failure.

## III. EXPERT TESTIMONY FAVORABLE TO PLAINTIFFS' THEORIES OF CAUSATION IS INADMISSIBLE

Rule 56 of the Federal Rules of Civil Procedure governs the types of evidence a court may consider in ruling on a motion for summary judgment. In this matter, the parties have submitted expert testimony in the form of affidavits and depositions, both of which may be considered in resolving Defendants' Motions. Fed. R.Civ.P. 56(c). From within these types of evidence, a court may consider "such facts as would be admissible in evidence." *Id.* Therefore, facts and opinions stated by an

expert's deposition or affidavit may be considered if they would be allowed in evidence under the Federal Rules of Evidence. *Weit v. Continental Ill. Nat'l Bank & Trust Co.*, 641 F.2d 457, 467 n. 38 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); *In Re Agent Orange Product Liab. Litig.*, 611 F.Supp. 1223, 1239 (E.D.N.Y.1985), *aff'd*, 818 F.2d 187, *cert. denied sub nom. Lombardi v. Dow Chem. Co.*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).

Coherent facts and opinions stated by an expert may meet the standard of relevance provided by Rule 401 of the Federal Rules of Evidence, but may be held inadmissible if they run afoul of some other Rule. Article VII of the Rules provides the procedure to determine whether opinion testimony is admissible. An expert must clear three independent steps (or tests) before the expert's testimony is admissible. First, the person must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Second, the court must find that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the particular instant facts or data upon which an expert bases an opinion or inference must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703. As with all questions of admissibility, each of these findings regarding a witness' testimony is a matter of law made by the trial judge.

At this point, Defendants have not contended that the "experts" proffered in this case are not qualified to render opinions on the etiology of Mr. Porter's acute renal failure.[6] Thus, the first test to determine whether expert testimony is admissible shall be considered satisfied. The critical question in this matter is whether the experts' opinion testimony can help the trier "*determine* a fact in issue"; if the opinions

---

**6.** To the extent that Defendants have called Dr. Benjamin's qualification into question, the issue

is mooted by the Court's decision in this matter.

do not serve this function, then they are inadmissible. Expert testimony is at its most powerful when the expert provides an opinion about a fact in issue—when the expert takes a side. In performing this function, the expert creates a syllogism for the fact finder: The expert compares data from the instant case with known scientific relationships and reveals a conclusion about the instant case based on the comparison.

Professor Imwinkelreid insightfully labelled the known scientific relationship(s) the "major premise" of the syllogism. Edward J. Imwinkelreid, "The 'Bases' of Expert Testimony: The Syllogistic Structure of Testimony," 67 N.C.L.Rev. 1 (1988). For example, it may be a known scientific fact that a particular combination of substances X and Y is the only known cause of reaction Z; thus, the major premise is that whenever reaction Z is observed, it must have been caused by a combination of X and Y. The "minor premise" of the expert's syllogism concerns the relevant facts of the case at issue. *Id.* In the example above, the minor premise would be that the expert observed reaction Z. The logical conclusion from the syllogism—the substance of the expert's ultimate opinion—is that the reaction Z in this particular case was caused by a combination of X and Y.[7]

■ Rule 702 governs the determination whether or not the expert's major premise—the "scientific" or "epidemiological" basis of the opinion—is acceptable. If, because of the expert's knowledge of relevant scientific relationships (facts), the expert's particular use of those relationships in the instant case will help the trier determine a fact, then the opinion is admissible under Rule 702. If an opinion lacks foundation and therefore would "not actually assist the jury in arriving at an intelligent and sound verdict," then it is inadmissible. *Loundermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir.1988); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir.1987) (affirming summary judgment for defendant

on issue of causation). An expert's mere guess or conjecture is properly excluded, because an expert is a conduit of facts and not merely a subjective speculator relying on stature alone. *American Nat'l Bank & Trust Co. v. K–Mart Corp.*, 717 F.2d 394, 399 (7th Cir.1983).

■ Rule 703 governs the determination whether or not the minor premise—the facts from the particular patient, accident, transaction, etc. issue—is acceptable. In this matter, these facts are derived from are medical data about Plaintiff Manual Porter, such as the amount of ibuprofen he ingested, his prior medical history, his biopsy slides, etc. These facts must be of a type reasonably relied upon by experts in the particular field in forming the ultimate opinion rendered by the experts in this matter. An expert may rely *only* on evidence on which a reasonable expert in the field would rely. *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir.1987). Thus, if a nephrologist or renal pathologist would reasonably determine the fact of causation from the medical facts known about Manual Porter, then Rule 703 is satisfied.

■ To determine whether the particular facts or data known about the instant case are of a type reasonably relied upon by experts, the Court must consider the methods reasonable medical experts in nephrology or renal pathology would use to arrive at etiological conclusions. These methods will of course vary depending upon the particular scientific discipline at issue and the current state of their understanding of the fact at issue. In general, for facts and data to be of a type reasonably relied upon by experts to form an opinion, there must be a connection between the currently-observed facts and some known scientific paradigm. For example, if empirical research established that ingestion of 3000 milligrams of ibuprofen in an hour would cause acute renal failure in ninety-five percent of the male population, then the fact that a male ingested that amount would likely be of a

7. Of course, most major premises are not stated with absolute certainty and would therefore be expressed in degrees of certainty or probability.

The ultimate conclusion would be expressed taking these probabilities into account.

type reasonably relied upon to form an opinion of causation. Plainly, the types of facts upon which an expert may reasonably rely are controlled and ultimately "qualified" by the empirical or other data accepted in the field. Therefore, the "reasons," (Fed.R.Evid. 705) "basis," "method," or "major premise" of an expert's opinion must have scientific support beyond the testifying expert's own hypothesis; there must be some data or established paradigm that provides the "reasonably reli[able]" reference point for the minor premise and ultimate opinion.

■■■■■] Every medical expert in this matter agrees that there is no scientific data establishing a causal link between ibuprofen and any RPGN or between interstitial nephritis and RPGN. At one time or another, Drs. Combs, Wells, Del Greco and Benjamin each made a statement of opinion either broadly or particularly supporting Plaintiffs' theories of causation. Dr. Wells is not a nephrologist and admitted that her opinion was merely a "curbside" observation based upon a temporal relationship; hers is not an admissible expert opinion. In his medical reports, Dr. Combs made general statements that Mr. Porter's problems were caused by ibuprofen. Dr. Combs acknowledged later that there are no scientific studies or data supporting his observations; he made the causal connection based primarily on the temporal relation between the ingestion and the injury. His opinion on causation is inadmissible, because it is not based on the type of facts reasonably relied upon in the field of nephrology to form such an opinion.

■■■■■■ Dr. Benjamin stated the opinion that ibuprofen caused Mr. Porter's RPGN, which caused his acute renal failure. His testimony demonstrates patently that he is not familiar with this particular area of renal pathology and that his opinion is merely conjecture. Absent personal re-search or reliance upon other studies on this subject, Dr. Benjamin's opinion on causation is inadmissible. Although Dr. Del Greco has performed extensive research on the effects of ibuprofen on the kidney, he could not cite any personal study confirming his theoretical opinions stated in this matter; to wit, his own research did not confirm the opinions he stated. Dr. Del Greco echoed every other medical professional by stating that he was aware of no other study or data that supported his theories of causation. Dr. Del Greco opined that interstitial nephritis was the primary event causing RPGN because he believed the interstitial nephritis lesions were older than the anti-GBM lesions. He prefaced his opinion of causation by saying that regarding the "chronology or sequence of events, I think one has to speculate." (Del Greco Dep. at 79.)

No expert can form the necessary syllogism required by Rules 702 and 703. No expert can state the opinion that Mr. Porter's injury was caused by a *known* iatrogenic reaction, because there is no such known reaction. They cannot compare the facts of this case with data establishing the causal connection provided in Plaintiffs' theories and then present the opinion that this case is factually similar to that data. Their testimony does not use scientific evidence to explain how Mr. Porter's injury is merely an example of an iatrogenic reaction established and described in studies performed in their medical field. Instead of offering a judgment about the applicability of known data to explain Mr. Porter's injury, the experts offer a mere possibility of an unsupported and therefore hypothetical explanation for the acute renal failure. The "opinion" that the facts of a case fit an expert's own unsupported, unproven hypothesis does not help determine a fact in issue and is therefore inadmissible.[8]

---

**8.** In a recent case, the Seventh Circuit stated that "Rule 705 of the Federal Rules of Evidence allows experts to present naked opinions." *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir.1989). The court could not have meant this statement as it appears out of context, because Rule 705 does not in fact allow naked opinions. The Rule does not relieve an expert from the duty to provide the "reasons" (the major premises) for the opinion; it allows an expert to state an opinion without disclosing the underlying "facts and data" (the minor premise) underlying the opinion. Moreover, a naked opinion would fall prey to Rules 702 and 703 without supporting factual information (major premise).

Merely because an opinion of scientific causation comes from a person learned in medical science does not provide that opinion with a sufficient scientific basis. An expert cannot rely solely on his or her own stature, intellect or intuition to support an opinion admissible to aid the trier of fact. The basis—the "reasoning" *and* "facts and data"—of an opinion is distinct from the expert's qualifications as an expert in the field. An expert's qualifications reflect the expert's knowledge of relevant scientific facts and skill in making comparative judgments. The factual basis of a particular medical conclusion is composed of an application of particular scientific facts to particular data about the instant case. Admissible opinions relate instant facts to known relationships; an opinion relating instant facts to an unknown relationship (a hypothesis) does not further the trier of fact's ability to determine a fact dependent upon that hypothetical relationship. Although experts may provide opinions in the form of a hypothetical fact *situation,* the scientific foundation or reasoning process may not be based on merely hypothetical causal *relationships.* Unsupported subjective opinion is unhelpful speculation and not admissible under Rule 702.

As Judge Weinstein observed, "Courts are particularly wary of unfounded expert opinion when causation is the issue." *In Re Agent Orange Product Liab. Litig.,* 611 F.Supp. at 1249 (citing cases). Expert testimony that merely relates a hypothetical or inferential causal relation between a drug and a disease is not probative and cannot provide the basis for a reasonable finding of fact.[9] *See* 3 Jack B. Weinstein & Margaret Berger, WEINSTEIN'S EVIDENCE § 702[1] (1990). To the extent that such an opinion might be minimally probative, its prejudicial effect—reliance on the expert's stature instead of intrinsic probative value of evidence—will outweigh the minimal probative effect the evidence may have. Fed. R.Evid. 403. In a highly technical case like this, where a lay trier of fact cannot possibly determine the precise etiology of the injury without guidance from expert opinions, there is a risk that the jury would make an irrational finding of causation based upon the siren-like allure of opinions stated by highly qualified experts. Thus, an expert's opinion must have *some* basis other than hypothesis before the opinion may have the privilege of being assailed by cross-examination.[10]

The bottom line is that a reasonable nephrologist or renal pathologist would not rely upon the types of facts available in this matter to make a reasonable diagnosis that ibuprofen caused Mr. Porter's acute renal failure. Upon the facts presented, an opinion stating a causal connection between ibuprofen and Mr. Porter's injury surely would subject the opiner to considerable scorn within learned

9. Of course, the mere fact that an expert's opinion may make it more likely that the trier of fact would find the fact of causation does not make the opinion "probative" for purposes of Rule 401. An opinion tending to sway the jurors is not equivalent to an opinion tending to prove a fact. When evidence would merely affect the lay person's "irrational" opinion about a fact rather than providing reliable proof of that fact, the evidence is neither probative nor admissible.

10. Some opinions have noted that some factors informing an expert's opinion go to the opinion's weight and not its admissibility. *See e.g., Bob Willow Motors, Inc. v. General Motors Corp.,* 872 F.2d 788, 797 (7th Cir.1989). As such, these factors are properly the subject of cross-examination and not judicial examination. For example, an expert's particular methodology in performing an experiment (e.g. calibrating equipment or random sampling) or an expert's reliance on particular studies over other studies are these kinds of factors. However, there must be a fundamental factual basis for an opinion before questions about methodology become relevant; an opinion must be at least rational before its rationality may be questioned. As with any other kind of evidence, Rule 401 could be ignored in favor of reliance upon the enlightening effects of cross-examination; the courtroom could become a true "marketplace of ideas" where no statement of fact would be too absurd not to have its day in court. It is plain that a court would prolong trials, confuse the trier of fact and invite unprincipled results if it ignored the fundamental judicial function of screening evidence that does not meet the threshold test of raising the reasonable probability of a fact.

circles of the discipline.[11] Without instant or historical facts to support an opinion of causation, an expert has only an unsupported, hypothetical, inferential reasoning process to support an opinion on the fact of causation. Even though some experts are willing to state an opinion that they are satisfied of the causal connection to a "reasonable certainty," the data underlying the opinion is insufficient to allow those opinions to meet the tests for admissibility.

## IV. EXPERT TESTIMONY FAVORABLE TO PLAINTIFFS' THEORIES OF CAUSATION DOES NOT PROVIDE A SUFFICIENT BASIS FOR PLACING THAT FACT AT ISSUE

] Even if the expert opinions in this matter were admissible evidence, those opinions are not sufficient to meet the burden of proof required by Indiana law on the element of causation; therefore, the unsupported opinions cannot create an issue of fact necessary to withstand summary judgment of Plaintiffs' claims.

] Although federal rules of procedure and evidence determine the qualities of evidence properly considered in resolving a motion for summary judgment, placing the burden of proof and the evidentiary standard required for each element of a claim are determined by state law. The elements of a claim, the standard of evidence required for each element and placement of burdens of proof or production on each element comprise the substantive law governing this case. Under the doctrine provided initially in *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), these matters are governed by state law in a case heard under the diversity jurisdiction of a federal district court. In this matter, controlling substantive law comes from the forum state of Indiana, which was also the situs of the alleged wrongful conduct and injury.

] Absent any specific direction from Indiana law, this Court would apply a generic analysis to determine whether Plaintiffs' opinion evidence could reasonably establish the fact of causation by a preponderance of the evidence. However, Indiana courts have considered previously the issue whether unsupported expert opinions *can* be sufficient to state "specific facts" from which a reasonable juror could determine the fact of causation. Indiana law places on the claimant the burden of proving every element of a prima facie case, including the fact of causation. This mandatory causal connection must be established by "provable facts" and "cannot be based upon mere guess, conjecture, surmise, possibility or speculation." *Collins*, 693 F.2d at 640. Even if the possibility of causal connection is equivocal, the proponent has failed to meet the burden posed by the preponderance standard and an adverse summary judgment must be rendered as a matter of law. *Id.*

] Although Indiana law does not require experts to state their opinions to a particular degree of certainty, *Noblesville Casting Div. of TRW v. Prince*, 438 N.E.2d 722, 731 (Ind.1982), testimony as to mere possibilities will not alone suffice to place a fact in issue. *Id.; Watson*, 532 N.E.2d at 1195. Expert opinions regarding causation may be admissible, and yet in conjunction with other evidence may be insufficient to support a verdict. *Strong v. State*, 538 N.E.2d 924, 930 (Ind.1989). In *Noblesville Casting*, the Supreme Court reiterated the "well established" rule that "standing alone, an opinion which lacks reasonable certainty or probability is not sufficient evidence by itself to support a verdict." 438 N.E.2d at 731; *see also Glenn v. Board of Comm'rs*, 552 N.E.2d 485, 487 (Ind.Ct.App.1990). This rule holds true because "as award of damages may not be predicated purely on speculation." 438 N.E.2d at 731.

11. Judge Easterbrook struck a similar cord when attacking a banking expert's unsupported opinion: "Professor Bryan would not accept from his students or those who submit papers to his journal an essay *containing neither facts nor reasons;* why should a court rely on the sort of exposition the scholar would not tolerate in his professional life?" *Mid–State Fertilizer*, 877 F.2d at 1339. Although the Judge was not addressing Rule 703, the logic and sentiment apply directly to the language of *that Rule*.

Considering whether unsupported opinion testimony is sufficient to create a "fact issue" defined by Rule 56, the Seventh Circuit has agreed with the posture taken by Indiana law. In *Mid–State Fertilizer*, the court reviewed a district court decision finding that an affidavit containing an expert's unsupported opinion about a banking practice was not sufficient to create an issue of fact required to survive a summary judgment. 877 F.2d at 1339. In rejecting the expert's "naked" conclusion and affirming summary judgment, the court provided the reasons such opinions are practically without worth:

> Rule 56(e) of the Rules of Civil Procedure provides that affidavits supporting and opposing motions for summary judgment must do more than present something that will be admissible in evidence. They shall "set forth facts" and by implication in the case of experts (who are not "fact witnesses") *a process of reasoning beginning from a firm foundation. American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1579–80 (11th Cir. 1985). "It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies express reasons for judgment." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 627, 64 S.Ct. 281, 299, 88 L.Ed. 333 (1944) (Frankfurter, J., dissenting). [A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.

*Id.* (final citation omitted) (emphasis added). Concurring, Judge Ripple stated his belief that an unsupported opinion cannot satisfy the "specific facts" requirement of Rule 56 simply because such an opinion does not state "specific facts." *Id.* at 1341 (Ripple, J., concurring).

Similarly, the Eleventh Circuit has held that "conclusory allegations without specific supporting facts have no probative value." *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985). Without factual support, opinions are no more probative than the conclusory allegations of a party's pleading. Citing *Evers* favorably, Judge Easterbrook observed that expert witnesses are not in themselves "fact witnesses" and therefore require additional "specific facts" to satisfy the summary judgment standard. *Mid–State Fertilizer*, 877 F.2d at 1339. A party cannot create a genuine issue of fact merely by presenting an expert witness who is willing to express an unsupported opinion that favors the party's position. *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977) (Wright, J.) (expert's "theoretical speculations" not sufficient to satisfy summary judgment burden). In granting a motion for summary judgment in an anti-trust case, a district court stated: "Theoretical speculation, unsupported assumptions and conclusory allegations advanced by an expert are neither admissible at trial, nor are they entitled to any weight when raised in opposition to a motion for summary judgment." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 663 F.Supp. 1360, 1479 (D.Kan.1987) (rejecting affidavit containing unsupported expert opinion).

A long series of federal cases supports the legal principle that an expert medical opinion must have an epidemiological or scientific foundation to support a reasonable finding of fact. Many cases considered the pivotal issue of medical causation and held unsupported opinions inadmissible or insufficient to support a finding of fact. *See e.g., Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106 (5th Cir. 1991) (en banc), *cert. denied,* — U.S. —, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992) (summary judgment for defendant proper when expert's opinion was "mere hunch" and supported by "no scientific methodology"); *Ealy v. Richardson–Merrell, Inc.*, 897 F.2d 1159 (D.C.Cir.1990) (expert opinion without scientific foundation cannot form basis for finding of fact); *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir.) (en banc), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990) (failure to provide significant epidemiological proof on causation was fatal to plaintiff's case); *Novak v. United States*, 865 F.2d 718 (6th Cir.1989) (plaintiff judgment reversed because no objective scientific studies supporting causation theory); *Richardson by Richardson v. Richardson–Mer-*

rell, Inc., 857 F.2d 823 (D.C.Cir.1988), cert. denied, 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989) (judgment n.o.v. in favor of drug manufacturer affirmed because plaintiff's expert's theoretical speculations could not sustain burden of proving causation); Lynch v. Merrell–Nat'l Labs., Div. of Richardson–Merrell, Inc., 830 F.2d 1190 (1st Cir.1987) (summary judgment for defendant drug manufacturer affirmed because studies did not furnish sufficient foundation for plaintiff's expert's opinion on causation); Chaney v. Smithkline Beckman Corp., 764 F.2d 527, 529 (8th Cir.1985) (summary judgment in favor of drug manufacturer because expert stated that 20–80% probability that drug caused cancer; cannot allow jury to make finding of causation more narrow than expert can); Smith v. Ortho Pharmaceutical Corp., 770 F.Supp. 1561 (N.D.Ga.1991) (opinions were not supported by any reliable data were necessarily speculative and lacking sufficient foundation to be admissible); Viterbo, 826 F.2d at 422 (summary judgment granted because expert opinion unaccompanied by tests or other scientific data has "great possibility" of misleading jury); Wooten v. Johnson & Johnson Products, Inc. 635 F.Supp. 799, 804–05 (N.D.Ill.1986) (summary finding against causation granted when expert's affidavit was "replete with conclusory assertions unsupported by any specific facts").

In addition to the weight of authority holding that unsupported opinions are insufficient to raise an issue of fact, Plaintiffs could have predicted the outcome of this matter by reviewing a prior relevant decision from this Court, State Farm Fire & Cas. Co. v. Miles, 730 F.Supp. 1462 (S.D.Ind.1990), aff'd, 930 F.2d 25 (7th Cir. 1991) (table). In Miles, plaintiff's motion for summary judgment argued that defendants had submitted no specific facts establishing a question of fact about the defendant's mental state (an issue related to the contested insurance coverage). The defendant's treating psychiatrist made several statements of opinion about the defendant's mental state; these were "bald" statements of opinion, which were unsup-

ported by any facts or reasoning processes. Id. at 1472. This Court stated that

> summary judgment cannot be avoided by presenting conclusory testimony of an expert witness. Under Fed.R.Civ.P. 56(e), the party opposing summary judgment must present *specific* facts showing that there is a genuine issue for trial. Although Dr. Caudill invokes some of the "magic words" normally associated with a diagnosis of insanity, there is no factual basis to support the conclusion that Miles was insane at the time of the attack.

Id. This Court stated plainly and conclusively that it is

> not bound by [an expert] opinion simply because it comes from the mouth of an expert. The facts upon which the expert relies must be presented to the court, and those facts must indeed support the expert's opinion.

Id.

■ The degree of certainty with which an expert asserts an unsupported opinion is irrelevant if the opinion is in fact unsupported: "[E]ven a strongly asserted expert opinion . . . would not be enough, by itself, to avoid summary judgment." Id. Expert opinion testimony need not be taken as written in stone; a court need not "accept uncritically any sort of opinion espoused by an expert merely because his credentials render him qualified to testify. . . . Whether an expert's opinion has an adequate basis, and whether without it an evidentiary burden has not been met, are matters of law for the court to decide." Richardson by Richardson v. Richardson–Merrell, Inc., 857 F.2d at 829.

In sum, there are at least two reasons unsupported expert opinions are insufficient to survive a motion for summary judgment. First, unsupported opinions do not state "specific facts" required by Rule 56(e) to establish an issue of fact, because bald opinions do not state the factual basis underpinning them. Second, unsupported opinions are insufficient because they do not provide a sufficient basis from which a reasonable juror *could* find for the nonmovant on the element of the prima facie

claim at issue. This is so because the trier of fact cannot make an expert's opinion *more* certain or reasonable; the trier of fact's finding on an fact provable by expert testimony can be only as reasonable and probable as the expert's opinion. *See Chaney,* 764 F.2d at 529 (if expert cannot state whether a conclusion is more or less likely than not true, then jury cannot narrow range of probability to make a finding of fact based on that testimony). For these sound reasons, Indiana law and the clear weight of persuasive authority holds that unsupported expert opinions are insufficient to meet the degree of certainty required to find the fact of causation.

## V. SUMMARY JUDGMENT STANDARD TO VIEW EVIDENCE SUBMITTED IN THIS MATTER

In three opinions presented in 1986, the Supreme Court provided clear guidance about the burdens each party must bear in stating and opposing a claim for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[12] After the movant makes a showing that there may be no genuine issue of fact, the burden shifts to the non-movant to establish a genuine issue of fact. The non-movant must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The non-movant must submit evidence that, without considering evidence to the contrary, and considering all reasonable inferences from it, will support a reasonable finding of fact. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

■ Viewing the evidence most favorably to the non-movant does not mean

that a court considers "in a vacuum" only those precise statements and items favorable to the non-movant's position. In regard to expert testimony, a court must consider the expert's favorable statements in the context of all statements made by the testifying expert. Therefore, a non-movant cannot claim that a court should consider only those aseptic, excised statements that *appear* to be favorably probative. If the movant can show that the testifying expert made statements expressly refuting or qualifying the apparently favorable statement, then this evidence must be considered also. This is not a case where the degree of "reasonable inferences" is an issue; either the opinions are supported by facts or they are not.

## VI. PLAINTIFFS' EVIDENCE FAILS TO CREATE AN ISSUE OF FACT REGARDING THEIR THEORIES OF CAUSATION

■ Understandably, Plaintiffs have submitted no direct evidence that ibuprofen caused Mr. Porter's acute renal failure. This is so because there were no monitors observing the alleged drug-tissue interaction while it happened. Therefore, Plaintiffs must rely on circumstantial evidence to establish what events occurred to cause Mr. Porter's injury.

Documents prepared by Mr. Porter's surgeon and attending physician may be admissible, but are not sufficient to create a genuine issue of fact. An Operative Report, prepared by Mr. Porter's kidney surgeon, Dr. Cutshall, states that Mr. Porter was "in chronic renal failure from probable toxicity from nonsteroidal antiinflamatory drug (Motrin)...." (Combs Dep.Ex.A.) To the extent that this document contains a medical opinion, that opinion is not supported by any scientific data accepted in the profession. Similarly, a Discharge Summary and a Report of Consultation prepared by Mr. Porter's nephrologist, Dr.

---

12. In addressing the proper standard for summary judgment, Plaintiffs' reply "briefs" cited pre–1986 federal cases. (Pls.' Br. Opp'n Def. Upjohn's Mot.Sumn.J. at 9–10; Pls.' Resp.Def. Whitehall's Mot.Summ.J. at 12–13.) This Court assumes that Plaintiffs' use of inaccurate authority is the result of a legal research oversight rather than a conscious effort to distort the current state of federal summary judgment law.

Combs, both state Dr. Combs' opinion that ibuprofen caused "all of [Manual's] problems." (Combs Dep.Ex.A.) Any probative weight these documented opinions may have had was completely destroyed by Dr. Combs' admissions that they were merely unsupported opinions about Mr. Porter's condition. (Combs Dep. at 44–45.) [13] Thus, there is no admissible, sufficiently probative evidence in this matter other than the deposition and affidavit testimony of the medical experts.

The primary issue for the Court to determine is this: Does the expert opinion testimony make it reasonably possible to find that it was more probable than not that Mr. Porter's chronic renal failure would not have occurred but for his ingestion of ibuprofen? Plaintiffs asserted that ibuprofen caused interstitial nephritis, which itself caused sufficient damage to cause the renal failure. Plaintiffs asserted in the alternative that ibuprofen caused interstitial nephritis, which in turn caused RPGN, which caused Mr. Porter's renal failure. Have Plaintiffs' submitted sufficient evidence in support of either of these two theories of causation?

Plaintiffs' evidence must support each step in Plaintiffs' causal chain of events. If Plaintiffs have not submitted specific facts to show that each causal relationship is more probable than not, then the theory requiring the relationship will fail for want of reasonable evidence. There is sufficient evidence to find that Mr. Porter took ibuprofen and thereafter suffered an acute renal failure; however, Plaintiffs have submitted insufficient evidence to support a reasonable finding that Mr. Porter's acute renal failure would not have occurred but for his ingestion of ibuprofen.

An opinion that ibuprofen caused interstitial nephritis which itself caused Mr. Porter's acute renal failure is purely theoretical and without a basis in scientific fact. Moreover, such an opinion contradicts directly the experts' unanimous conclusion that RPGN caused Mr. Porter's renal fail-ure. *Every* expert agreed that Mr. Porter had RPGN and that RPGN was the cause of his acute renal failure. Plaintiffs' Response placed paramount emphasis on Plaintiffs' mistaken belief that Dr. Niles believed that Mr. Porter did not have RPGN. (Pls.Resp. Whitehall Defs.' Mot. Summ.J. at 9, 11, 16.) In fact, Plaintiffs failed to read Dr. Niles' deposition correction sheet, which made plain that he believed that RPGN caused Mr. Porter's renal failure. (Niles Dep. at 97.) Thus, Plaintiffs' first theory of causation (ibuprofen = = > interstitial nephritis = = > acute renal failure) fails for a lack of evidence.

There is clear evidence that Mr. Porter had interstitial nephritis. Based upon scientific studies that non-steroidal anti-inflammatory drugs, like ibuprofen, can cause interstitial nephritis, a reasonable trier of fact could find that ibuprofen caused or contributed to Mr. Porter's interstitial nephritis. However, Plaintiffs' theory that interstitial nephritis caused RPGN which then caused Mr. Porter's acute renal failure is directly refuted by the statements of every expert. Every expert agrees that there is absolutely no medical evidence that interstitial nephritis can progress to or cause RPGN; to the contrary, interstitial nephritis is *expected* to occur secondary to glomerulonephritis. (Ferris Dep. at 40; Combs Dep. at 56–57; Del Greco Dep. at 143.)

Dr. Del Greco stated firmly that there is no data supporting his theory and that it is merely a hypothetical explanation. (Del Greco Dep. at 103–09, 133–35.) Dr. Del Greco's opinion that interstitial nephritis caused Mr. Porter's RPGN was based solely upon his interpretation of the relative age of different lesions shown on Mr. Porter's biopsy slides. (*Id.* at 144.) Dr. Del Greco thought the interstitial lesions were older than the glomerular lesions, so he opined that the interstitial nephritis caused the RPGN. (*Id.*) He admitted this was merely a hypothesis in search of proof.

---

**13.** In addition, Dr. Combs testified the diagnosis of Mr. Porter's kidney problem could be established by a pathological exam only—something he had not performed or seen when he made the former opinion. (*Id.* at 9–10.)

(*Id.* at 146.) After stating that his theory of causation was based solely on this perceived temporal relationship between the lesions, Dr. Del Greco admitted that a temporal relationship alone does not constitute proof of causation. (*Id.* at 153.) Thus, Plaintiffs' second theory of causation fails for lack of evidence that interstitial nephritis can cause RPGN, which was in fact the cause of Mr. Porter's acute renal failure.

## FINDINGS OF FACT

1. Plaintiff Manual Porter ingested ibuprofen in the form of Advil, manufactured by the Whitehall Defendants, and Motrin, manufactured by the Upjohn Company.

2. Mr. Porter took fourteen Motrin tablets between October 13, 1986 and November 7, 1986.

3. Mr. Porter took approximately fifteen Advil tablets between November 7, 1986 and November 18, 1986; he never took more than two tablets per day.

4. On November 19, 1986 Mr. Porter developed symptoms of renal failure and experienced an acute renal failure shortly thereafter.

5. Mr. Porter's acute renal failure was caused by RPGN, either anti-GBM or MPRN.

6. Mr. Porter also experienced interstitial nephritis, which was secondary to his RPGN.

7. There are no medical studies, reports or data establishing that RPGN is an iatrogenic effect of ibuprofen; there are no known, documented cases where ibuprofen caused RPGN.

8. There are no medical studies, reports or data establishing that interstitial nephritis can progress to or cause RPGN; there are no known cases where interstitial nephritis progressed to or caused RPGN.

9. Ibuprofen did not cause Mr. Porter's acute renal failure.

## CONCLUSIONS OF LAW

1. Causation is essential element of each of Plaintiffs' claims against the Defendants.

2. Expert opinion testimony is necessary to establish the fact of a causal relationship between ibuprofen and Mr. Porter's acute renal failure.

3. Expert opinion testimony is not admissible if it is not supported by reasoning derived from scientific studies, reports or data.

4. Expert opinion testimony is not admissible if it is not based upon facts or data of a type reasonably relied upon by experts in the particular field to form the opinion rendered.

5. An expert in the field of nephrology would not rely on the fact of a temporal relationship between ingestion of a drug and acute renal failure to render a reasonable opinion that the drug was the cause of the acute renal failure.

6. An expert in the field of nephrology would not rely solely on the perceived temporal relationship between renal lesions to render a reasonable opinion that one disease caused another.

7. Expert opinion testimony submitted in this matter to establish that Mr. Porter's acute renal failure was caused by ibuprofen is not admissible evidence, because it is wholly unsupported by any scientific data and is based upon facts and data of a type not relied upon in the particular field to form an opinion regarding the cause of an acute renal failure.

8. Even if it were admissible, expert opinion testimony favorable to Plaintiffs' theories of causation is not sufficient to create an issue of fact because the expert opinions fail to state "specific facts" as required by Federal Rule of Civil Procedure 56(e).

9. Expert opinions favorable to Plaintiffs' theories of causation are merely hypotheses unsupported by scientific data and therefore fail to provide a basis for a reasonable finding that it is more likely than not that Mr. Porter would not have experienced an acute renal failure but for his ingestion of ibuprofen.

10. In whole, Plaintiffs failed to submit sufficient facts from which a trier of fact could make a reasonable finding that it is

more likely than not that Mr. Porter would not have experienced an acute renal failure but for his ingestion of ibuprofen.

11. The necessary factual issue of causation may be determined as matter of law in favor of Defendants and against Plaintiffs.

12. Each of Plaintiffs' claims is defective for complete failure of the essential element of causation.

13. All Defendants are entitled to judgment in their favor on every claim Plaintiffs brought against them in the Amended Complaint.

14. Defendants' Motions for Summary Judgment shall be granted in full and Judgment shall be entered that Plaintiffs shall take nothing from any claim against any Defendant.

### CONCLUSION

Plaintiffs' asserted causal relation between Defendants' drug products and Mr. Porter's disease seems intuitively possible or maybe even likely; however, this relationship cannot be proved by the evidence submitted in this matter. Testimony from experts on the leading edge of this field demonstrates only that ibuprofen *may* cause the type of renal failure suffered by Mr. Porter, but the causal relationship is merely a possibility without any empirical support. The law is plain that a mere possibility of causation is not sufficient to allow a reasonable juror to find causation as a fact, especially in the highly technical and generally inaccessible realm of drug and tissue interaction.

The weight of authority is clear that medical facts must first be considered reasonably certain in *at least one* laboratory or study before they may be found as facts in the courtroom. A jury cannot step blindly where science fears to tread. Because Plaintiffs have failed to meet their burden to provide a jury with the necessary tools to make a reasonable finding of fact on the issue of causation, Defendants' Motions for Summary Judgment will be GRANTED. A contrary holding would ignore the judicial function and allow the jury an opportunity to make an irrational finding on an issue of central importance in this matter.

### ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF WHITEHALL LABORATORIES, INC., AMERICAN HOME PRODUCTS CORPORATION, AND THE UPJOHN COMPANY

This matter came before the Court upon the Motions For Summary Judgment of Whitehall Laboratories, American Home Products Corporation and The Upjohn Company ("Defendants.") For the reasons discussed in a Memorandum Entry entered contemporaneous with this Order, the Court now GRANTS Defendants' Motions. It is hereby ORDERED that Plaintiffs shall take nothing by their Amended Complaint for Damages against all Defendants and a summary JUDGMENT is entered in favor of all Defendants and against Plaintiffs on all counts of Plaintiffs' Amended Complaint for Damages.

ALL OF WHICH IS ORDERED.